EASTERN INVESTMENT AND DEVELOPMENT CORP. & others
*vs.* A. A. FRANKS & another.

Suffolk. February 2, 1959. — May 26, 1959.

Present: WILKINS, C.J., RONAN, SPALDING, WILLIAMS, & CUTTER, JJ.

*Waiver. Contract,* Waiver. *Equity Pleading and Practice,* Suspension of decree pending appeal; Orders of Supreme Judicial Court pending appeal; Contempt proceeding; Master: discharge of reference. *Contempt.*

In a suit in equity by the maker of a promissory note payable in two instalments six months apart and providing for acceleration of maturity upon a default in payment of "any installment," commenced against the payee one day prior to the date the first instalment was payable for the purpose of restraining the defendant from enforcing the note until

the second instalment became due and from withdrawing from a voting trust certain stock placed therein by him pursuant to a contract between the parties under which the note had been given, an unequivocal repudiation by the plaintiff in the bill of all liability for the first instalment until the second instalment should become due constituted a waiver of an alleged term of the contract that the defendant would not withdraw the stock from the trust upon a default in payment of an instalment on the note without first giving the plaintiff notice thereof and an opportunity for ten days to pay the instalment due. [287]

Following an order of a single justice of the Supreme Judicial Court suspending the operation of a final decree in a suit in equity pending an appeal by the plaintiffs upon condition that they furnish the defendant a bond for payment, if the decree should be affirmed, of any loss which he might suffer as a result of the suspension and as established in proceedings instituted after the disposal of the appeal, and retaining jurisdiction to make "any other or further orders and decrees . . . to carry out and enforce the purpose and intent" of the order, the single justice had power to clarify and amend that order by a further order. [291–292]

Following an order of a single justice of the Supreme Judicial Court suspending the operation of a final decree in a suit in equity pending an appeal by the plaintiffs upon condition that they furnish the defendant a bond for payment, if the decree should be affirmed, of any loss he might suffer as a result of the suspension and providing that the order might be "amended to require additional security from the plaintiffs as a condition for the further continuance of the suspension," a further order of the single justice, unconditional on its face, requiring the plaintiffs to post an additional surety bond in a substantial amount was construed as requiring the additional bond as a condition of continuance of the suspension, and so construed was proper; the further order gave the plaintiffs a choice between posting the additional bond and suffering revocation of the suspension upon motion of the defendant, and contempt proceedings did not lie against the plaintiffs because they chose not to post the additional bond. [292–293]

Reading §§ 19 and 22 of c. 214 of the General Laws together, the power of this court under § 22 to modify or annul a prior order made for the protection of the rights of the parties pending an appeal may be exercised after the appeal has been entered in this court. [293]

The record in proceedings following an order by a single justice of the Supreme Judicial Court suspending the operation of the final decree in a suit in equity pending an appeal and a reference by the single justice of certain matters to a master disclosed no abuse of discretion in a later order discharging the order of reference where it appeared that a radical change in circumstances during the hearings before the master removed the issues referred to him from the case. [293]

Where it appeared that a single justice of the Supreme Judicial Court ordered the operation of a final decree in a suit in equity suspended pending an appeal by the plaintiffs on condition that they permit the defendant to exercise the right of a stockholder to obtain information

from a certain corporation, and retained jurisdiction to make further orders and decrees, "including contempt decrees," to carry out the purpose of the order, that subsequently the defendant filed a petition in the county court to have the plaintiffs adjudged in contempt for interference with his right to obtain such information, and that that petition had not been passed upon when the full court heard and decided the appeal in the equity suit and affirmed the decree, the case was remanded to the county court for action on the matter of contempt if pressed by the defendant. [293–294]

BILL IN EQUITY, filed in the Superior Court on November 13, 1957.

The suit was heard by *Morton,* J. Certain matters heard in the Supreme Judicial Court for the county of Suffolk were reported by *Counihan,* J.

*Richard Wait,* for the plaintiffs.

*Meyer H. Goldman & Charles M. Goldman,* (*Gerald Gillerman & Marshall L. Tutun* with them,) for the defendants.

SPALDING, J. This case comes here by an appeal and a report. The appeal is by the plaintiffs from a final decree of the Superior Court denying an injunction against the enforcement of a promissory note and the dissolution of a voting trust. The report is by a single justice of this court of the questions presented by six matters heard by him in proceedings pending the determination of the appeal.

### THE APPEAL.

The nature of the case brought here by the appeal can best be described by summarizing the pleadings. The plaintiffs in this suit in equity are Eastern Investment and Development Corp. (hereinafter called Eastern), a Pennsylvania corporation, Earl Belle, and Edward, Burton and Murray Talenfeld. The individual plaintiffs were officers and directors of Eastern and were its sole stockholders at the time (November 13, 1957) the bill was filed. In substance it was alleged that Eastern entered into a written agreement, dated April 26, 1957, with the defendant A. A. Franks for the purchase from Franks of one million shares of the common stock of Cornucopia Gold Mines (hereinafter called Cornucopia), a Washington corporation, for the sum of

$240,000, of which $150,000 was to be paid in cash and the balance of $90,000 by a promissory note. The agreement provided that Eastern would place six hundred thousand shares in escrow until the note was paid. The Pilgrim Trust Company of Boston (hereinafter called Pilgrim) was named as escrow agent. As part of this agreement Franks was to transfer another one million shares of Cornucopia to a voting trust, of which he and the individual plaintiffs were to be trustees. These shares were also to be held by Pilgrim as escrow agent. Under the terms of the agreement the $90,000 promissory note was to be noninterest bearing and was to mature on May 14, 1958, or one year from its date, whichever should be later.

It was alleged that Franks orally represented to Eastern that he had certain obligations to Pilgrim which he was having difficulty in meeting and that in order to alleviate this difficulty the note should be made payable as follows: $45,000 on November 14, 1957, and $45,000 on May 14, 1958, with provision for acceleration of maturity if the maker defaulted on the first payment; that Franks informed Eastern that he would not seek to enforce payment on November 14, 1957, and that if Pilgrim, which was to be the holder of the note, insisted on payment on that date, he, Franks, would pay it and look to Eastern for reimbursement on or after May 14, 1958; that Pilgrim was informed by Franks of this supplementary agreement; that the representations made by Franks were false and made with the intent to deceive the plaintiffs, since he knew that Pilgrim would seek to enforce payment of the instalment due on November 14, 1957, and he had no intention of making any payment for Eastern on that date; that Eastern signed the promissory note in the form suggested by Franks in reliance upon his misrepresentations; and that Franks, on November 1, 1957, notified Eastern that a payment of $45,000 would be due on November 14. It was further alleged that if Eastern did not pay $45,000 on November 14, 1957, it would be considered in default on the note, and Franks would withdraw the one million shares of Cornucopia stock from the voting

trust and Pilgrim would sell the collateral for the note. The bill prayed that Franks be restrained from enforcing the note prior to May 14, 1958, and from withdrawing any shares from the voting trust, and that Pilgrim be restrained from delivering any shares to Franks and from selling the collateral for the note.

A temporary restraining order conforming to the prayers of the plaintiffs was granted, conditioned on the filing by the plaintiffs of surety bonds totaling $71,000.

Franks in his answer admitted the execution of the written agreement but denied the existence of any agreement not to enforce the payment of the November instalment due on the note. Included in Franks's answer was a counterclaim alleging that Eastern had wilfully defaulted on the note, and asking that the plaintiffs be adjudged to have forfeited any rights to the shares in the voting trust. Pilgrim by its answer denied any knowledge of any arrangement between Eastern and Franks concerning the November instalment, and alleged that it was the holder in due course of the note. In a counterclaim Pilgrim asked that judgment be entered in its favor against Eastern in the full amount of the note, with interest, and that it be allowed to sell the stock held by it as collateral and to apply the proceeds toward the satisfaction of Eastern's indebtedness.

The evidence is reported and the judge made findings of material facts. Facts found by us and by the judge include the following. The contents of the basic contract of sale dated as of April 26, 1957, are substantially as alleged in the bill. It appears from this contract that the two million shares of Cornucopia stock held by Franks prior to the sale constituted a majority of the common stock issued and outstanding. At the closing of negotiations, held in Boston on May 15, 1957, the promissory note was drafted in its final form and signed by Belle for Eastern. It contained a promise to pay the principal amount of $90,000 in instalments of $45,000 on November 14, 1957, and $45,000 on May 14, 1958. There was a provision for acceleration of maturity if Eastern should fail to pay "any installment."

The note was accompanied by a certificate signed by the secretary of Eastern to the effect that a vote of its board of directors had authorized Belle to sign a note containing those terms. On the same day Franks indorsed the note and delivered it to Pilgrim.

An agreement establishing the voting trust was also executed at the time of the closing. The voting trust was to continue for ten years, subject to Franks's option to tender the shares held by the voting trustees to Eastern between May 14, 1960, and June 14, 1960, at a price of $250,000. Eastern was obligated to accept and pay for the stock if such a tender was made, in which event the voting trust would terminate. This agreement contained no provision for the termination of the voting trust upon a default on the $90,000 note.

Franks's rights upon a default in the two blocks of stock to be placed in escrow became a matter of concern during the closing negotiations and, as a result, the basic contract was amended. With respect to the six hundred thousand shares to be held as collateral for payment of the note the amendment provided that: "In the event . . . [Eastern] defaults in the payment of either installment due under said note . . . [Franks], and the escrow agent at the request of . . . [Franks], shall notify . . . [Eastern] of such default by registered mail and the escrow agent, subsequent to the expiration of a period of 10 days following the mailing of such notice shall sell the shares then held in escrow . . . unless said default is cured by . . . [Eastern] within said 10 day period." The letter of instructions to Pilgrim as escrow agent executed at the same time contained an identical provision.

With respect to the one million shares to be placed in the voting trust, the amendment provided that upon a default in the payment of either instalment Franks, "in addition to his right to have the escrow agent sell the stock then held in escrow [as collateral] as above provided, shall have the further right to withdraw his certificates representing the . . . [one million shares] from the voting trustees and the voting

trust agreement . . . thereafter shall be void and of no further effect." However, there is a discrepancy between this provision and those contained in the letter of instructions to Pilgrim as escrow agent for the voting trust shares. These instructions included a notification procedure prior to termination upon default similar in all respects to the one specified as a condition precedent to the sale of the shares held as collateral.

Considerable testimony was introduced in support of the case stated in the plaintiffs' bill. In his report of material facts the judge found that "the plaintiffs failed to prove to me that any . . . collateral or dominating oral agreement was entered into between the defendant and Eastern" to the effect that payment of the November 14, 1957, instalment required by the note would not be sought. The judge then found that the first instalment was due and not paid, and that as a consequence Eastern was in default, and that the entire principal amount of the note was due. He ordered a final decree entered dismissing the bill. There was ample evidence to support these findings and they cannot be said to be plainly wrong. Indeed, the note has been paid during the pendency of this appeal, and the plaintiffs do not now attack that part of the final decree ordering the payment of the $90,000.

In passing upon the counterclaim of Franks, the judge found that Eastern, by reason of its having "wilfully defaulted in its agreement" had forfeited any rights it may have had in the continuation of the voting trust, and that under the terms of the contract, as amended, Franks had the right to withdraw the one million shares held by the trustees. He also ruled that in so far as any requirement of notification had been created by the escrow letter, Eastern's conduct after November 1, 1957, relieved Franks and Pilgrim from giving such notice. The plaintiffs' attack is directed at these rulings and at that portion of the decree which gives them effect.

The plaintiffs argue that the decree was erroneous because by failing to give effect to Eastern's rights to notice upon

default and a ten day grace period in which to cure the default the decree violates the settled principle that equity will not enforce a forfeiture.

The second escrow agreement of May 15, under which the voting trust shares were deposited with Pilgrim, is the only document executed by the parties mentioning the notification procedure and the grace period. The basic contract of sale, dated as of April 26, 1957, allows Franks to withdraw the shares without notice immediately upon default. The form of escrow agreement attached to the basic contract contains no provisions for notice. The amendments to the contract, executed at the same time as the final escrow agreement, reaffirm Franks's right of withdrawal without notice. The voting trust agreement itself, also executed at the time of the closing on May 15, is likewise silent on this question. Thus there is an irreconcilable conflict between the provisions of the escrow agreement and those of the basic contract and the amendments.

The parties to the escrow agreement were Pilgrim, Franks in his individual capacity, and Franks and the individual plaintiffs in their capacity as voting trustees. The parties to the basic contract and the amendments thereto were Franks and Eastern. There are cogent reasons for holding that the right of notification and the right to cure the default claimed by Eastern never became part of the contract between Eastern and Franks. But we will assume, without deciding, that they did.

Even under this assumption it cannot be said that the decree deprived Eastern of any right of substance. This is so because the plaintiffs in their bill unequivocally repudiated all liability for the $45,000 instalment due on November 14, 1957. This repudiation constituted a waiver by Eastern of the notice provision, if there was one which was legally operative, inserted for its benefit. See *Bowen* v. *Farley,* 256 Mass. 23, 26; *Jackson & Co. (Inc.)* v. *Great Am. Indem. Co.* 282 Mass. 337, 342. Furthermore, the plaintiffs obtained ex parte restraining orders preventing Franks from taking steps to exercise his right of withdrawal. Franks, by filing

his counterclaim asking that the plaintiffs be adjudged to have forfeited any rights they may have had under the escrow agreement, gave notice in the only manner then available to him. Paraphrasing a statement made in *Standard Oil Co. of N. Y.* v. *Y-D Supplies Co.* 288 Mass. 453, 455, a "more definite and insistent form of . . . [notice] could hardly be imagined." See *Cassiani* v. *Bellino,* 338 Mass. 765, 767–768.

The right of Franks to withdraw his shares from the voting trust was before the court because of his counterclaim and Eastern's answer to it. In these circumstances the giving of notice would have been an empty ceremony. The "law does not require the doing of a useless act." *Loomer* v. *Dionne,* 338 Mass. 348, 353. We recognize that the judge did not base his decision on the precise ground discussed above, although there is language in his findings pointing in that direction, but that is of no consequence; the correctness of the result is all that matters. See *Weidman* v. *Weidman,* 274 Mass. 118, 125.

The final decree is affirmed. The defendants are to have costs of this appeal.

## The Report.

The final decree was entered in the Superior Court on January 22, 1958, and the plaintiffs duly claimed an appeal. Thereafter, the plaintiffs filed a petition in this court to suspend the operation of the decree pending the appeal. G. L. c. 214, § 22, as amended through St. 1948, c. 309. On February 12, 1958, a single justice of this court allowed the petition on the following terms: (1) Eastern was to pay the $90,000 note immediately; (2) the plaintiffs were to give to Franks a $100,000 surety company bond (one purpose of this bond was to assure payment of any loss Franks might suffer as a result of the suspension of the decree, if the decree should be affirmed by the full court); (3) a proxy to vote the shares in the voting trust was to be delivered to a trustee appointed by the court; and (4) Franks was to be allowed to exercise all rights of a stockholder, other than the right to vote, as

to the shares in the voting trust, including the right to obtain information from Cornucopia.

The order provided that this court "retains jurisdiction to make any other or further orders and decrees, including contempt decrees, to carry out and enforce the purpose and intent of this . . . [order] . . ." and concluded with the statement that ". . . this . . . [order] may be amended to require additional security from the plaintiffs as a condition for the further continuance of the suspension of the decree." The $90,000 note was paid immediately and the bond, signed only by Eastern and a surety company, was filed.

On April 28, 1958, Franks filed a petition for contempt against the plaintiffs alleging that they had failed to comply with the provisions of the order of February 12, 1958, which forbade interference with Franks's right to obtain information from Cornucopia. On May 12, 1958, Franks filed a motion in effect to revoke the suspension order of February 12, based on the withholding of information as to the affairs of Cornucopia. After hearings on the petition and the motion, another single justice of this court entered an order on May 26, 1958, appointing a master to make findings on certain matters, including (1) the details of the acquisition or proposed acquisition by Cornucopia of seven other corporations,[1] (2) the details of any plan for financing these acquisitions which had been submitted or would be submitted to the Securities and Exchange Commission, (3) the financial condition of Cornucopia and its status on the American Stock Exchange, and (4) the effect on the proposed acquisitions of the bankruptcy of Alabama Acceptance Corporation, one of the parties to the proposed plan of acquisition. The hearings before the master commenced on June 8, 1958, and as the hearings progressed it was shown that radical changes in circumstances had resulted in a substantial lessening of the value of Cornucopia stock. While

---

[1] The plaintiffs had assumed control of Cornucopia following the closing on May 15, 1957.

the hearings were in progress the Securities and Exchange Commission commenced hearings in connection with a proxy statement submitted by counsel for Cornucopia. The deterioration of events culminated early in July, when the plaintiff Belle fled to Brazil, taking with him substantial sums of money belonging to Eastern, Cornucopia and certain of the corporations in the plan of acquisition.

On July 1, 1958, Franks filed a motion to increase the plaintiffs' bond, and on July 29 an order was issued by still another single justice of this court requiring the plaintiffs to furnish an additional surety company bond in the amount of $200,000. On August 4, counsel informed the justice that the Talenfelds did not "now wish a further continuance of the suspension on these new terms."[1] No bond was furnished. The Talenfelds duly claimed an appeal from this order, but no appeal was ever claimed by Belle or Eastern. On August 11, Franks filed a second petition for contempt, based on the refusal to furnish the additional bond and an allegation that the refusal was part of a scheme of the plaintiffs to use the court as a means of effecting a delay in which Belle could abscond with the assets of Cornucopia.

Meanwhile, on July 16, Franks filed a motion for an order declaring that the plaintiffs were jointly and severally liable without limitation for any loss suffered by Franks as a result of the stay. This motion was denied without prejudice, but the denial was later vacated in order that the matter could be reported without decision.

On September 10, Franks filed a motion to broaden the scope of the order of reference to the master. At the same time the Talenfelds filed a motion to discharge the order of reference upon the allegation that a petition in bankruptcy had been filed against Cornucopia. The latter motion was allowed on October 17, and Franks duly claimed an appeal. Meanwhile, it was suggested to the court that Eastern had been adjudicated a bankrupt pursuant to an involuntary

[1] Counsel for the plaintiffs withdrew their appearances for Belle and for Eastern on July 8. The single justice acknowledged the withdrawals on July 23, but ordered that the withdrawals did not terminate their appearance for the purpose of service of process.

petition filed against it in the United States District Court for the Western District of Pennsylvania on August 14. Subsequently, counsel for the plaintiffs entered an appearance for Eastern's receiver in bankruptcy.

On October 2, Franks filed a motion for a new order of reference to the master upon allegations that Belle and the Talenfelds had joined in a conspiracy to divert the assets of Eastern and Cornucopia to themselves by means of a number of fraudulent transactions.

The single justice reserved and reported without decision the following matters: (1) Franks's motion for a further order establishing unlimited liability for losses suffered by him; (2) Franks's second petition for contempt; (3) Franks's motion to expand the scope of the order of reference to the master; and (4) Franks's motion for a new order of reference to the master. The single justice also reported the questions presented by: (a) The order discharging the order of reference to the master; and (b) the order requiring the posting of an additional bond.

## The Motion for Further Order.

As stated above, Franks filed a motion for a further order to establish the joint and several liability of the plaintiffs (unlimited by the penal sum of the $100,000 surety bond) for any losses suffered by him as a result of the suspension of the decree.

We do not think that the single justice intended to report to this court the question of discretion as to whether or not this motion should be granted. Obviously, in a complex and fluid situation such as this one the single justice exercising day to day supervision over the proceedings is peculiarly fitted to pass upon the propriety of granting a motion of this character. We assume, therefore, that the sole question before us is whether the single justice had power to grant such a motion, although even under this assumption, it is difficult to see any life to this question at the present time. Speaking generally, we think that such power exists, provided that

the motion is considered as one to clarify or amend the initial order entered by the first single justice who dealt with this case. A reference to that order makes it clear that the liability imposed for any loss suffered by Franks was conditioned upon the suspension of the decree. Any amendment of that order necessarily would have to be subject to the same condition. We might also add that any amendment to that part of the initial order which deals with liability for loss would have to be hinged on the requirement of the initial order that the amount of any loss caused by the suspension must be established in proceedings instituted after the disposal of the appeal. The liability imposed was not automatic. A more difficult question is whether such an order could be made unlimited as to amount, but it would appear that this question is now academic and we do not decide it.

## THE ORDER FOR THE ADDITIONAL BOND AND THE PETITION FOR CONTEMPT BASED UPON IT.

The single justice's order of July 29, 1958, required the plaintiffs to post an additional surety bond in the amount of $200,000. This order was unconditional on its face. The petition for contempt filed by Franks on August 11, 1958, was apparently based on the notions that the order imposed an absolute obligation on the plaintiffs, and that the failure to comply was contumacious conduct on the part of the plaintiffs.

An absolute order requiring a party to give a bond, not imposed as a condition for the granting of some relief, would be most unusual and would present grave questions as to the power of the court to issue such an order. Therefore, we construe the order as one imposed as a condition upon the continuance of the stay. This construction is strengthened by the fact that the initial order contained the proviso that "this . . . [order] may be amended to require additional security from the plaintiffs as a condition for the further continuance of the suspension of the decree of January

22, 1958." Viewed in this manner, the order clearly was a proper one.

A party ordered to furnish security as a condition for the grant of a stay sought by him has a choice. If he declines to furnish the security he is not entitled to a stay, but he ought not to be adjudged in contempt as a result of the exercise of that choice. Franks misconceived his remedy when he filed his petition for contempt. His remedy was to seek a revocation of the stay. This he did not do.

We recognize that under G. L. c. 214, § 19, upon entry of an appeal in this court all proceedings under the decree appealed from are automatically stayed.[1] *Lowell Bar Assn.* v. *Loeb,* 315 Mass. 176, 189. However G. L. c. 214, § 22, provides that the "supreme judicial court may . . . modify or annul any order made for the protection of the rights of the parties, pending the appeal." Reading §§ 19 and 22 together, as we must, we think that the power to modify or annul a prior order pending appeal under § 22 may be exercised after the appeal has been entered in this court.

THE MOTIONS ON THE RULE TO THE MASTER AND THE ORDER DISCHARGING THE EXISTING RULE.

These matters may be disposed of briefly. The issuance of an order of reference to a master and the terms of such an order are peculiarly within the province of the single justice. With regard to the justice's action in discharging the order of reference, the record before us raises no question of law other than the possibility of an abuse of discretion. We find no such abuse. A radical change in circumstances removed the issues referred to the master from the case. This is also true with respect to the issues included in Franks's motion to broaden the scope of the hearing.

However, the motion for a new order of reference does raise a substantial point. The petition seeking a decree

---

[1] The pertinent portion of § 19 reads, "When . . . appeals have been entered . . . [in the Supreme Judicial Court] all proceedings under such decree shall be stayed."

adjudging the plaintiffs in contempt of the order of February 12 by reason of interference with Franks's right to obtain information from Cornucopia has never been passed upon. In so far as Franks's motion for a new order of reference seeks to press the petition he is entitled to a hearing. The judge may in his discretion refer the matter to a master. But Franks is not entitled to a hearing upon his allegations that the plaintiffs conspired to defraud him. These contentions are outside the scope of this case.

## CONCLUSION.

It would appear from the foregoing discussion that few, if any, of the matters reported by the single justice now constitute live issues, with the exception of Franks's first petition for contempt and the motion for an order of reference pertaining to it. The case is remanded to the county court for action on these matters not inconsistent with this opinion.

*So ordered.*