ROBERTA KROKYN vs. WILLIAM KROKYN.

Middlesex. February 7, 1979. — June 6, 1979.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Divorce*, Alimony. *Contempt. Tenancy by the Entirety. Husband and Wife.*

Real estate held by a husband and wife as tenants by the entirety could be considered in addition to income in evaluating the ability of the husband to make support payments to a former wife under a divorce decree. [210-214]

Evidence in a hearing on a contempt petition for a husband's failure to make support payments to his former wife as required by a divorce decree supported the judge's finding that the husband had the present ability to pay arrearages on the basis of his ownership of an interest in property held by him and his present wife as tenants by the entirety. [214-216]

LIBEL for divorce filed in the Probate Court for the county of Middlesex on August 29, 1969.

A complaint for contempt, filed on April 30, 1976, was heard by *Martin*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Herbert A. Horgan, Jr.*, for the defendant.

*Leonard L. Lewin (Valerie Y. Belsky* with him) for the plaintiff.

QUIRICO, J. The parties in this case were divorced by a decree which became final on June 30, 1970. An agreement dated December 23, 1969, was incorporated therein.

The agreement required the husband William Krokyn to pay the lump sum of $1,992 to the wife Roberta. It further required William to pay Roberta the sum of $75 a week for her support in biweekly instalments until the happening of certain specified events. The agreement contained other provisions not relevant here.[1]

William made the $75 weekly payments for several years, and he paid $500 of the lump sum. He ceased making payments in September of 1975. Thereafter, on April 20, 1976, Roberta filed a contempt petition. Hearings thereon were held on January 18, 1977, and on January 25, 1977. The probate judge found William in arrears in the amount of $5,949.50. He concluded that William "at all times possessed, and still possesses, the ability to make the support payments called for in the Agreement incorporated into the divorce decree dated December 29, 1969,[2] being the owner of a one half interest in real estate having a present equity of at least $70,000 . . . ." The judge found William in civil contempt and sentenced him to ten days' imprisonment.[3] William appealed, and we ordered

---

[1] The only child of William and Roberta had apparently reached majority, and no provision for child support was made in the agreement.

[2] The December 29, 1969, date corresponds to the decree nisi, which automatically became final six months after entry. See G. L. c. 208, § 21.

[3] Execution of the sentence was immediately stayed by the probate judge pending appellate review, and no part thereof has yet been served.

The order entered in the Probate Court does not in terms order William to pay the arrearages or permit him to purge his contempt at any time by so paying. Colloquy between the judge and counsel made clear that the judge intended the order to contain such terms. In addition, the finding of civil, as opposed to criminal, contempt necessarily imports such usual terms. See *Bolduc* v. *Dahlstedt*, 6 Mass. App. Ct. 946 (1978). We are not, therefore, faced with the question whether the order (with its reference to past ability) was primarily punitive and supportable only on a finding of criminal contempt. See *Sodones* v. *Sodones*, 366 Mass. 121, 130 (1974), and cases cited; *Furtado* v. *Furtado*, 7 Mass. App. Ct. 522, 525-526 (1979); *Ainslie* v. *Ainslie*, 6 Mass. App. Ct. 692, 693-694 (1978). In any event, no such contention has been briefed.

the case transferred to this court on our own motion. See G. L. c. 211A, § 10 (A). We hold that there was no error.

William does not now controvert the existence or the amount of his arrearages under the support provisions of the agreement and decree. He argued below that he lacked the ability to comply with his support obligations, and he now argues that the judge's finding of ability was clearly erroneous.[4] Proven inability to pay the arrearages found by the judge would, of course, have precluded incarceration. *Salvesen* v. *Salvesen*, 370 Mass. 608, 611 (1976). *Milano* v. *Hingham Sportswear Co.*, 366 Mass. 376, 378 (1974) (dictum). *Sodones* v. *Sodones*, 366 Mass. 121, 130-131 (1974). See generally Note, The Rising Divorce Rate: Familiarity Breeds Contempt, 11 Suffolk U.L. Rev. 1059, 1072-1077 (1977). Because the evidence in this case is reported, "the appeal brings before us all questions of law, fact, and discretion." *Cohen* v. *Murphy*, 368 Mass. 144, 147 (1975). Cf. *Sodones* v. *Sodones*, *supra* at 125-127 (limited review when evidence not reported). In these circumstances our review is not limited to the judge's stated basis for his decision, viz., whether William's ownership of the one-half interest in a house would alone support the judgment. See *Ezekiel* v. *Jones Motor Co.*, 374 Mass. 382, 390 (1978); *E. Whitehead, Inc.* v. *Gallo*, 357 Mass. 215, 219 (1970); *Eastern Inv. & Dev. Corp.* v. *Franks*, 339 Mass. 280, 288 (1959); *Ratte* v. *Forand*, 299 Mass. 185, 187 (1938). We therefore examine the entire evidence bearing on William's ability to pay.

The judge heard testimony from William and from William's present wife, Shirley Krokyn, tending to show the following. William married Shirley in 1971. He is an ar-

---

[4] William also sought a modification of the original decree, and the judge received evidence concerning that issue in conformity with *Salvesen* v. *Salvesen*, 370 Mass. 608, 610-611 (1976). The judge took the question of modification under advisement, but the record does not show what, if any, ruling he made thereon.

chitect employed by a corporation of which he is president and the only stockholder. His income, derived primarily from "management fees" paid by the corporation, was about $13,000 in 1973, $18,000 in 1974, and $17,000 in 1975. He received no income in 1976. The corporation had, however, been earning about $2,300 a month on account of William's services until shortly before the hearing and had an expectation of earning about $1,300 a month at some time in the future. The corporation had recently been operating at a loss, relying on loans made by Shirley and various banks in order to pay its creditors.

Shirley is a district manager for Avon Products,[5] and she is also a real estate developer. Together with William, she participated in several rehabilitation projects that yielded modest net profits and, in one case, a net loss. She is the treasurer of William's corporation but draws no salary therefor. She supplied the funds used by William to meet support obligations in the several months preceding the hearing.

Between them William and Shirley own two inoperative automobiles and use a car supplied by Avon for transportation. They own a house as tenants by the entirety. This house had initially cost $58,000 and was initially encumbered by a $45,000 mortgage. Shirley supplied the additional funds needed to purchase it. About eight months before the hearing, William and Shirley had improved the house at a cost of about $80,000. William did most of the work himself, and Shirley supplied the money needed for materials and outside labor. The house was worth between $140,000 and $200,000 at the time of the hearing and was encumbered by a $70,000 mortgage. Approximately $25,000 of the proceeds of the new mortgage loan had been used to pay William's business debts.

In summary, the testimony showed that William and Shirley had customarily lived in relatively affluent cir-

---

[5] We assume that Shirley's employer is the distributor of cosmetic products commonly known as "Avon."

cumstances but that William had few financial resources
beyond his somewhat conjectural prospects of future em-
ployment as an architect. The only significant asset avail-
able to William "at the time the order was entered"
(*Salvesen* v. *Salvesen, supra*) was the house then occupied
by William and Shirley. There was evidence that the
equity in this house was between $70,000 and $130,000
and that William and Shirley held title as tenants by the
entirety. There was also evidence that Shirley had sup-
plied most of the money used to purchase and remodel the
house, while William had contributed labor and exper-
tise. The question for decision on this appeal is, therefore,
whether William's interest in the house was sufficient to
warrant a finding that he had the present ability to pay
the arrearages in his support payments to Roberta at the
time he was found in contempt. We hold that it was suffi-
cient.

Notwithstanding the misgivings expressed by the
judge,[6] we think it clear that capital assets may be consid-
ered in addition to income in evaluating the ability of a
contemnor to purge his contempt. E.g., *Firestone* v. *Fire-
stone*, 263 So. 2d 223, 226 (Fla. 1972); *Kay* v. *Kay*, 37
N.Y.2d 632, 636 (1975). Difficulty arises in this case, how-
ever, from the unique character and incidents of a tenan-
cy by the entirety. "The nature of a tenancy by the entire-
ty is thoroughly established by our decisions. It is founded
on the common law doctrine of the unity of husband and
wife as constituting in law but one person. A conveyance
to a husband and wife as tenants by the entirety creates
one indivisible estate in them both and in the survivor,
which neither can destroy by any separate act. Both hus-

---

[6] After entering the contempt judgment, the judge said, "It might be
added, and this is not part of these findings, that the status of the law
with respect to contempt proceedings is in a good deal of confusion as
a result of some recent decisions. It may well be that what the [Su-
preme Judicial] Court means by having ability to pay does not include
such things as equity and real estate. Here we have no way of know-
ing."

band and wife are seized of such an estate *per tout et non per my* as one person, and not as joint tenants or tenants in common. Alienation by either the husband or the wife will not defeat the right of the survivor to the entire estate on the death of the other. There can be no severance of such estate by the act of either alone without the assent of the other, and no partition during their joint lives, and the survivor becomes seised as sole owner of the whole estate regardless of anything the other may have done." *Bernatavicius* v. *Bernatavicius,* 259 Mass. 486, 487 (1927), and cases cited.

Despite the equality of interest shared by husband and wife in a tenancy by the entirety, our law traditionally accords the husband the exclusive right to possession and income during the joint lives. E.g., *Voigt* v. *Voigt,* 252 Mass. 582, 583 (1925). The husband may sell this interest, subject always to the wife's expectancy of full title should she outlive the husband (e.g., *Phelps* v. *Simons,* 159 Mass. 415, 418 [1893]), and his sole creditors may levy on that interest to satisfy his debts. E.g., *Raptes* v. *Pappas,* 259 Mass. 37, 38 (1927). In contrast, the wife's mere expectancy of title is neither alienable nor subject to execution by her sole creditors. *Licker* v. *Gluskin,* 265 Mass. 403, 407 (1929).

Although William's ability to sell his interest in the house has presumptive value, there was no evidence from which the judge could determine the value of William's alienable interest. The judgment must, therefore, stand or fall with the proposition that shared ownership of valuable equity demonstrates ability to pay even though Shirley's cooperation would be required in order for William to liquidate his holding. Although authority on this question is sparse, we think the better rule supports the result reached below.

The Florida District Court of Appeal has considered the present issue in a nearly identical factual context. In *Howard* v. *Howard,* 118 So. 2d 90 (Fla. App.), cert. denied, 122 So. 2d 409 (Fla. 1960), a divorced wife petitioned for

modification of a periodic alimony award. The husband
had remarried and, together with his new wife, ac-
cumulated valuable assets held in tenancy by the entire-
ty. The lower court denied the petition for modification
on the ground that the husband's interest in those assets
could not be reached by his sole creditors. *Id.* at 93. The
appellate court reversed, explaining that "[t]he court is
not warranted in assuming that any [modification] order
entered in this cause will not be promptly complied with
by defendant from such resources as are available to him.
It well may be that in order to pay plaintiff such increase
in alimony as the chancellor may find to be fair and just,
defendant may have to forego the practice of engaging in
speculative farming enterprises, and reduce in some
measure the luxurious scale on which the chancellor
found he now lives. These are problems, however, with
which the court is not concerned and which should not
influence a decision on the merits of this cause." *Id.* at 94.
The court added that no question was yet presented as to
whether or how the former wife might levy upon the
husband's interest. *Id.*

Following remand in the *Howard* case, the alimony
award was modified. The husband later failed to pay the
higher amount, and the former wife filed a contempt
petition. In *Howard* v. *Howard*, 130 So. 2d 83 (Fla. App.),
cert. denied, 133 So. 2d 646 (Fla. 1961), the District Court
of Appeal reconsidered the case in exactly the same pos-
ture as is involved here. Relying on the same reasoning
it had employed in the earlier opinion, the court conclud-
ed that the husband could be held in contempt. *Id.* at
85-86. It stated, "If [the husband] now finds himself in a
position where he is unable to liquidate such of his capital
assets as are necessary to meet his alimony obligations
because of his present wife's unwillingness to cooperate
to that end, this was a risk he voluntarily assumed when
he placed beyond his exclusive control assets which would
otherwise be answerable to the discharge of his alimony
obligations." *Id.* at 86.

Several courts have decided the closely analogous question whether to consider exempt property in assessing a support obligor's financial resources. Most courts have analyzed this question solely by determining whether or not a particular exemption from execution would defeat a claim for alimony or support. See *In re Smallbone,* 16 Cal. 2d 532, 534 (1940) (pension not exempt in hands of contemnor); *Ex parte Silvia,* 123 Cal. 293, 294 (1899) (imprisonment invalid where only asset was exempt homestead); *In re Irish,* 51 Idaho 604, 605 (1932) (semble) (value of adjusted compensation certificate irrelevant); *Hannah v. Hannah,* 191 Ga. 134, 137 (1940) (because government benefits not exempt, alimony decree could be entered that would effectively require payment therefrom); *Steller v. Steller,* 97 N.J. Super. 493 (1967) (compensation benefits not exempt from alimony claim and therefore properly considered); *Fordyce v. Fordyce,* 80 Misc. 2d 909, 912-915 (N.Y. Sup. Ct. 1974) (ability to pay determined by scope of exemption). As did the Florida court in the *Howard* case, however, some courts have considered the question of exemption to be distinct from the question of ability to pay. See *Cohen v. Murphy,* 368 Mass. 144, 148 (1975) (pension benefits); *Tully v. Tully,* 159 Mass. 91, 92-93 (1893) (pension benefits). Cf. *Walden v. Walden,* 486 S.W.2d 57, 59 (Ky. 1972) (shares in closed corporation having no ready market); *Renaud v. Renaud,* 118 R.I. 365, 368 & n.3 (1977), and cases cited (income of second wife). These authorities would seem to permit consideration of concededly exempt or unreachable assets for the basic reason that the contempt remedy does not implicate the rights of any class of creditors to attach particular property. As was said in the *Tully* case, no question arises "as to the manner in which the order of the court can or should be enforced." 159 Mass. at 93. See also *Cohen v. Murphy, supra* (quoting *Tully*).

Common sense and basic concepts of fairness support the notion that ownership of a valuable asset demonstrates ability to pay without further inquiry as to wheth-

er payment can be enforced directly against the asset. It is not error for the court to exert reasonable pressure, including an adjudication of contempt, to encourage the contemnor to exercise ingenuity in managing his affairs so as to fulfil his paramount support obligations. Neither the court nor the aggrieved obligee should be required to map in detail the method by which the contemnor will transform an asset into cash. The law does not require that an obligor be allowed to enjoy an asset — such as a valuable home or the beneficial interest in a spendthrift trust — while he neglects to provide for those persons whom he is legally required to support. Thus, both reason and precedent justify treating the ownership of assets as relevant evidence of ability to pay.

Within this framework, the factual issue before the probate judge was whether William had the ability to make the support payments in question. The extent of William's interest in the tenancy by the entirety was certainly relevant to that issue. See *Robbins* v. *Robbins*, 463 S.W.2d 876, 880-881 (Mo. 1971) (pension not yet reachable by anyone); *Person* v. *Person*, 189 Neb. 329, 329-330 (1972) (joint account in which husband had only income interest); *Robertson* v. *Robertson*, 215 Va. 425, 428 (1975) (speculative future benefits). The ownership of that interest by William supported an inference of his ability to pay the amount due. The evidence that Shirley had made all or most of the cash contributions to the equity did not compel a conclusion that William was not at least a part owner of the house.[7] *Ronan* v. *Ronan*, 339 Mass. 460, 462 (1959). For one thing, William presumably signed the mortgage notes and thereby pledged his own

---

[7] The parties have not raised the question whether William or Roberta had the burden of proof on the issue of ability to pay, and we do not decide it. The prevailing rule elsewhere appears to be that a contemnor must negate ability to pay. See *Page* v. *Page*, 235 Ga. 131, 136 (1975); *Garland* v. *Garland*, 30 Md. App. 45, 54 (1976); *Nelson* v. *Nelson*, 82 N.M. 324, 327 (1971); *Mixson* v. *Mixson*, 253 S.C. 436, 443 (1969).

credit. See *Ross* v. *Ross*, 2 Mass. App. Ct. 502, 509-510 (1974), cert. denied, 420 U.S. 947 (1975). For another, William invested his own labor and expertise in remodeling the house. Cf., e.g., *Berwin* v. *Cable*, 313 Mass. 431, 434-435 (1943) (joint venture existed where one party contributed only labor). On the record before him, therefore, the judge was fully justified in finding that William owned a capital asset probably worth about $35,000.

The parties have not presented the case in terms commensurate with the foregoing analysis. Before concluding this opinion, we deem it advisable to comment briefly on the issues that the parties have sought by their briefs to inject.

William's primary argument appears to be that the court somehow violated Shirley's rights by finding him in contempt. There would be a point to this argument if the judge had purported to adjudicate any of Shirley's rights, as for example by ordering her interest in the house, as well as that of William, sold and the proceeds applied to William's obligation to Roberta. Because Shirley does not share William's duty to obey the alimony decree, the sale of her interest as a tenant by the entirety would be unlawful. But the judge did not order the sale of Shirley's interest in the house. Shirley's right to resist a hypothetical future execution sale of her interest is not in issue.

Under the settled case law of this Commonwealth relating to tenancies by the entirety, a purchaser of William's interest in the house would be entitled to possession to the exclusion of Shirley. *Quinlan* v. *Weeks*, 332 Mass. 482, 483 (1955). *Raptes* v. *Pappas*, 259 Mass. 37, 38 (1927). William attempts to argue in his brief that the rule stated above no longer prevails because of the Massachusetts Equal Rights Amendment (art. 106 of the Amendments to the Massachusetts Constitution, amending Declaration of Rights, art. 1). See *D'Ercole* v. *D'Ercole*, 407 F. Supp. 1377, 1382 (D. Mass. 1976) (wife need not take title by conveyance creating male-dominated estate); *Klein* v. *Mayo*, 367 F. Supp. 583, 585 (D. Mass. 1973) (three-judge

court) (dictum that wife's acceptance voluntary), aff'd, 416 U.S. 953 (1974). See generally 4A R. Powell, Real Property par. 623, at 697-703 (Rohan rev. ed. 1979) (describing alternative possibilities for eliminating gender discrimination in tenancies by the entirety). Shirley is not, however, a party to this litigation, and the judge entered no order that will affect Shirley's rights. We therefore express no opinion on the merits of William's argument relative to the effect, if any, of the Equal Rights Amendment on the rule giving a husband a greater possessory interest in property held by entireties.

For the reasons previously explained, we hold that the judge did not err in finding William able to pay the arrearages on the basis of William's ownership of an interest in property held by him and his present wife as tenants by the entirety. The case is remanded for further proceedings consistent with this opinion.

*So ordered.*