RUBY W. WEST *vs.* FIRST AGRICULTURAL BANK.

Berkshire.   October 9, 1980. — February 12, 1981.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

JOAN McDOUGALL *vs.* S & S OF N. E., INC.

Middlesex.   October 8, 1980. — February 12, 1981.

Present: HENNESSEY, C.J., KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Constitutional Law,* Equal protection of laws, Equal Rights Amendment. *Tenants by the Entirety.   Real Property,* Tenancy by the entirety. *Landlord and Tenant,* Termination of tenancy.

Where a husband and wife, as tenants by the entirety, executed a deed which was duly recorded transferring the property to the wife as an individual, and the wife then executed a deed transferring the property back to herself and her husband as tenants by the entirety but the second deed was not recorded, this court assumed, without deciding, that the second deed was valid under G. L. c. 183, § 4, as against the wife and that the destruction of the second deed by the husband did not revive the first.   [540-541]

A fourteen-day notice under G. L. c. 186, § 12, to vacate was adequate to terminate a tenancy at will under which no rent had been requested or paid, and after such notice the tenant became a tenant at sufferance liable to pay a reasonable rent.   [541-542]

Discussion of constitutional considerations with respect to a tenancy by the entirety as it existed under Massachusetts law prior to its modification by St. 1979, c. 727.   [542-548]

In two cases in which plaintiff wives challenged on constitutional grounds the Massachusetts form of tenancy by the entirety as it existed prior to its modification by St. 1979, c. 727, this court, while recognizing certain constitutional problems with that form, declined to alter retroactively incidents of the tenancy as applied to the pre-modification transactions at issue.   [548-552]

The case of Ruby W. West *vs.* First Agricultural Bank was commenced in the Superior Court Department on De-

cember 7, 1979. A motion to dismiss was heard by *Alberti, J.* The Supreme Judicial Court granted a request for direct appellate review.

*George M. Nassar* for the plaintiff.

*David O. Burbank* for the defendant.

The case of Joan McDougall *vs.* S & S of N.E., Inc., was commenced in the Superior Court on February 14, 1978. The case was heard by *Fine,* J., on a master's report. After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*John J. Lynch* for the defendant.

*Walter E. Chambers* for the plaintiff.

KAPLAN, J. For convenience, we discuss in one opinion two cases in which the respective plaintiff wives sought to present constitutional challenges to the Massachusetts form of tenancy by the entirety as it existed before its reformulation by legislation that became effective in 1980 (St. 1979, c. 727, amending G. L. c. 209, § 1, effective February 11, 1980).[1] Invoked by the plaintiff Ruby West was the equal protection clause of the Fourteenth Amendment, and by both plaintiffs, art. 1 of the Massachusetts Declaration of Rights, as amended by art. 106 of the Articles of Amendment, effective November 2, 1976, which states in part, "Equality under the law shall not be denied or abridged because of sex . . ." (hereafter E.R.A., the Equal Rights Amendment).

We shall conclude by giving effect to the older form of the tenancy as to the pre-1980 transactions at bar in both cases. That form encounters some constitutional problems which we recognize and analyze. But the retroactive alteration of incidents of the tenancy which are sought in these cases, and which would apply in many like cases, is not required and would be undesirable. The Legislature has provided for the present and future.

1. *Facts and proceedings. West case.* The defendant First Agricultural Bank on August 7, 1979, recovered a defi-

---

[1] This legislation is described below at point 4.

ciency judgment of $36,179.52 upon a mortgage foreclosure against Ernest L. West, the plaintiff's husband. On September 15, 1979, the bank caused execution to be levied under the judgment on three parcels of land in which the husband had ownership interests, and notice was given of a sheriff's sale to occur on December 21, 1979. One of these properties was an improved parcel on Lafayette Street, Pittsfield, which had been held by the husband and the present plaintiff Ruby West as tenants by the entirety since 1954, and evidently was their residence.[2]

On December 7, 1979, the plaintiff commenced her action in Superior Court to enjoin the sale of the husband's interest in the Lafayette Street property.[3] That interest, under the classic form of tenancy by the entirety prevailing in Massachusetts, would consist of his exclusive right of control, possession, and income during the joint lives, together with an "indestructible" right to a remainder if he survived his wife; and the interest could be reached by the husband's individual creditors. The wife's interest consisted only of a corresponding right of survivorship, but this was not subject to levy by her creditors (or her husband's).[4] The wife in the

---

[2] So indicated by the plaintiff's counsel at argument, although not stated in the record.

[3] Although the description in the notice of the sheriff's sale of the other two parcels indicates that these also were held by the Wests together in some form of ownership, the present suit concerned only the Lafayette Street property.

[4] The survivorship right in either spouse was indestructible in the sense that partition was not (and continues not to be) available to a tenant by the entirety. See G. L. c. 241, § 1 (which has not been amended). But, as indicated, the husband in the classical tenancy could dispose alone of his survivorship right, while the wife could not so dispose of her survivorship. See *Licker* v. *Gluskin*, 265 Mass. 403, 404-407 (1929); *Raptes* v. *Pappas*, 259 Mass. 37, 38-39 (1927). Both spouses, acting together, could convey the estate, destroying both survivorships. See *Bernatavicius* v. *Bernatavicius*, 259 Mass. 486, 487 (1927). Cf. *Pineo* v. *White*, 320 Mass. 487, 491 (1946). Upon divorce the tenancy dissolved and became a tenancy in common (unless the parties intended or agreed otherwise). See *Bernatavicius, supra* at 490; *Finn* v. *Finn*, 348 Mass. 443, 446-447 (1965).

By way of contrast: a "joint" tenant has a right to the remainder if he survives the other, but the joint tenancy is destroyed if he aliens his inter-

*West* case was asserting that the Massachusetts tenancy as described was unconstitutionally discriminatory as based on sex; therefore she must be accorded some (not clearly expressed) rights of control, possession, and income in association (not clearly defined) with those of the husband, only joint obligations of both spouses being leviable by creditors, and then (presumably) against the entire estate. The court, rejecting the wife's contention, allowed the defendant bank's motion to dismiss the complaint for failure to state a claim, and we allowed an application for direct appellate review.[5]

*McDougall case.* These were the facts, as found by a master, with some amplification by the judge. The plaintiff Joan McDougall and her husband Duncan became tenants by the entirety of the property 615-631 Dutton Street, Lowell, on March 4, 1974. Before that date the premises were occupied by several businesses owned or controlled by the husband, including a corporation, S & S of New England, Inc. (hereafter New England). Just before the date of purchase, according to the master, New England was a tenant at will of the entire premises, paying rent to the prior owner, and allowing the other McDougall businesses to share occupancy with it. After March 4, 1974, the date of purchase, there was no agreement for payment of rent and no rent was paid; the husband simply withdrew from the businesses monthly the $1,500 needed to meet the mortgage requirements.

In May, 1976, the defendant corporation S & S of N. E., Inc. (hereafter S & S), acquired the assets and assumed the obligations of New England. The husband owned 700 of S & S's 1,000 shares; the plaintiff McDougall, one John Fin-

est, or creditors levy on his interest, or he partitions under G. L. c. 241, § 1. See M. Park, Conveyancing § 128, at 127-128 (1968).

Tenants in common have no survivorship rights; at death the interest of a tenant descends to his heirs or passes to his devisees. See Park, *supra* § 125, at 120.

[5] The sheriff's sale as related to the Lafayette Street property has been stayed pending appeal.

negan, and Doris Finnegan (his wife), each owned 100 shares. S & S remained an occupant of the premises. Still there was no agreement as to payment of rent by any occupant, and no rent was paid.

On May 12, 1977, the plaintiff and her husband, advised by the husband's attorney, executed a deed transferring the property to the plaintiff as an individual, and the plaintiff, in turn, executed a deed transferring the property back to the plaintiff and her husband as tenants by the entirety.[6] The former deed was recorded on May 17, 1977. The latter deed was not recorded. It was left in the custody of the attorney. The husband later obtained the deed, and sometime in spring, 1978, tore it into pieces, and handed the pieces to the plaintiff. She produced the pieces (taped together to form the entire deed) at the master's hearing.

On September 9, 1977, the husband sold his 700 shares in S & S to John Finnegan for $20,000. The purchase agreement stated that S & S "occupied" as a tenant at will. At that time Finnegan asked the husband about future rent, but the husband refused to discuss the question and never thereafter raised the question. Finnegan had no discussion at the time with the plaintiff about rent.

On the September, 1977, date of the sale of stock to Finnegan, the plaintiff and her husband had been separated for over a month, and the husband sued for divorce on November 9, 1977. In early November the plaintiff approached Finnegan about rent. He gave her two checks totalling $300 but then declined to pay any more. On November 5, 1977, the plaintiff served on S & S a fourteen-day notice under G. L. c. 186, § 12, to vacate for nonpayment of rent.

On February 14, 1978, the plaintiff commenced the present action against S & S for rent from June 1, 1977.[7] On

---

[6] Other properties were also included in these deeds.

[7] The complaint also named as defendants Union National Bank (mortgagee) and city of Lowell (contractually bound to make payments to S & S). The claims against those two defendants, which do not figure in our present considerations, remain pending, and so a certificate of the judge below under Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974) (judg-

February 17, 1978, the husband brought his separate action against S & S for rent for the same period.[8]  On March 1, 1978, the Union National Bank took possession of the Dutton Street property upon foreclosure of a mortgage held by it which had been given by Joan and Duncan McDougall when they acquired the property in 1974.

On March 6, 1978, the two actions were referred to a master to report his findings of fact and conclusions of law without returning a transcript of the evidence.  But on April 21, 1978, the husband's complaint against S & S was dismissed for his failure to appear for a deposition after notice by S & S,[9] so the master was confined to the wife's action for rent, the subject of the present appeal.

The master reported in August, 1978, his findings of fact and conclusions of law, and a general finding for the defendant.  As matter of law, the master held that the second deed of May 12, 1977, constituted a legal reconveyance of the property to husband and wife as tenants by the entirety. It followed, according to the master, that only the husband, in his right of control, possession, and income during the joint lives, could claim rent from the property.  See *Cunningham* v. *Ganley*, 267 Mass. 375, 377 (1929); *Wingrove* v. *Leney*, 312 Mass. 683, 684 (1942).  Therefore he concluded for the defendant S & S in the action.

---

ment upon multiple claims or involving multiple parties), was needed to allow separate appeal of the judgment against S & S.  The parties make no point of this.  We shall dismiss the appeal as a technical matter, but state our view of the merits.  See *Freedman* v. *Schneider*, 7 Mass. App. Ct. 852 (1979).  Cf. *Maldonado, petitioner*, 364 Mass. 359, 366 (1973).

The answer of S & S to the complaint against it, besides denials, pleaded a counterclaim against the plaintiff charging that she had conspired with her husband to defraud the corporation.  The counterclaim is irrelevant, since the trial judge affirmed the master's finding for the plaintiff on the counterclaim, and this is not contested.

[8] Also joined as defendants in the husband's action were the Union National Bank and city of Lowell.

[9] For the sanction of dismissal of the husband's claim, see Mass. R. Civ. P. 37 (d), 41 (b) (3), 365 Mass. 797, 803 (1974).

The judge of the Superior Court accepted the master's findings of fact but expressed no opinion as to his conclusion about the validity of the reconveyance. If that conveyance was ineffective, then the plaintiff was the individual owner and in a position to demand all the rent. But, said the judge, if the conveyance recreated a tenancy by the entirety, that estate was unconstitutional under the E.R.A. in so far as it vested in the husband the sole right to control, possession, and income during the joint lives. Therefore, the judge reasoned, the wife must be accorded a corresponding right. This might have suggested that she should recover one-half the rent. Yet the judge, holding that a rent obligation arose from the plaintiff's demand, which in the judge's view changed S & S's status as a tenant at will without rent into the status of a tenant at sufferance, allowed the plaintiff a recovery against S & S of $6,000, being the full reasonable rental (as found by the master) of $1,500 per month for the four months, November, 1977, through February, 1978 (to the date of foreclosure of March 1, 1978). From a judgment to this effect, S & S appealed, and we brought the case here on our own motion.[10]

2. *Constitutional questions as tendered by the parties.* In neither case has it been argued that the 1980 legislation is operative, and we accept for purposes of these cases that it is not operative. Then in the *West* case, the wife's claim that creditors could levy only for defaulted joint obligations of the spouses seeks and is predicated upon changes in fixed rules of property on constitutional grounds.

As to the *McDougall* case, a constitutional issue would not arise if the reconveyance could be considered ineffective, leaving the whole fee in the plaintiff wife. We are not bound to accept the master's conclusion of law to the contrary (see Mass. R. Civ. P. 53 [e], as amended, 367 Mass. 917

---

[10] Also appealed were denials of S & S's postjudgment motions to vacate judgment, for a new trial, for leave to file a jury claim late, for a jury trial, and to consolidate the case with the one by Duncan McDougall against S & S for rent. Consideration of these motions is unnecessary in view of the result envisioned by this opinion.

[1975]; *Jones* v. *Wayland,* 374 Mass. 249, 255 [1978]; *Wormstead* v. *Town Manager of Saugus,* 366 Mass. 659, 660 [1975]), and the legal question is open to dispute, but we think the master was probably correct. Under G. L. c. 183, § 4, as appearing in St. 1973, c. 205, an unrecorded deed conveying "an estate in fee simple . . . shall not be valid as against any person, except the grantor . . . and persons having actual notice of it . . . ." The plaintiff was the grantor. She has argued that the object of the statute was only to protect subsequent purchasers against prior unrecorded conveyances. That might be the statute's primary purpose, but it may rule also against a grantor's taking unfair advantage of a recording system to deny a deed she executed but did not record.[11] The plaintiff has also argued that the tearing up of the second deed in effect reinstated the first. But that second deed had previously been delivered through its being placed and remaining in the possession of the attorney, and its destruction, even by the husband as one of the grantees, would not produce the result of reviving the first, see 3 American Law of Property § 12.85, at 367-368 (A.J. Casner ed. 1952),[12] whatever might be the force of an argument of estoppel as between a grantor and a grantee who later tore up the dispositive instrument. See *id.,* § 12.85, at 368; 4 H.T. Tiffany, Real Property § 1067, at 476 (3d ed. 1975).[13]

There is the further question whether the plaintiff's notice was a proper procedure for initiating a duty on S & S's part to pay rent, even if it be assumed that she had a substantive right to the rent. *Yoffe* v. *Krasnow Wool Stock Co.,* 322 Mass. 211, 212-214 (1948), held that a fourteen-

---

[11] The master found that Doris Finnegan typed both the first and second deeds for Duncan McDougall. Thus there were at least intimations that S & S was on "actual notice" of the unrecorded deed.

[12] See also *Hatch* v. *Hatch,* 9 Mass. 307, 311-312 (1812); *Simmons* v. *Simco,* 192 Ark. 518, 520 (1936); *Standard Trust & Sav. Bank* v. *Fernow,* 317 Ill. 325, 333-334 (1925); *Krach* v. *Carson,* 150 Md. 659, 662 (1926); 4 H.T. Tiffany, Real Property § 1067, at 475-476 (3d ed. 1975).

[13] The master found no evidence that the conveyance and reconveyance transaction was intended to defraud creditors.

day notice to a tenant at will to quit for nonpayment of rent did not terminate the tenancy where the tenant had attempted to pay the agreed upon rent; a separate lengthier notice under G. L. c. 186, § 12, would be required. We doubt the relevance of *Yoffe* (and possibly even of any part of G. L. c. 186, § 12) to a case where no rent was being paid (though none had previously been demanded), and think the notice adequate to terminate immediately a gratuitous tenancy. The upshot, as the judge concluded, was that after notice S & S became a tenant at sufferance (see G. L. c. 186, § 3) liable to pay a reasonable rent, assuming the plaintiff had a capacity to act as landlord, and that turned on the constitutional issue.

3. *General constitutional considerations.* The plaintiffs contend that, before its 1980 statutory modification, our local form of tenancy by the entirety, preserving precisely the ancient estate,[14] was sex-biased and presented features which were offensive to the standard of the equal protection clause and (a fortiori) to that of the E.R.A.[15] On a surface

---

[14] Of the twenty-odd States in which tenancies by the entirety still exist, only Massachusetts, North Carolina, and Michigan preserved into modern times the tenancy's traditional husband oriented form. See Phipps, Tenancy by Entireties, 25 Temp. L.Q. 24, 29-31 (1951); Note, Effect of the Married Women's Property Acts upon Estates by the Entirety, 37 Harv. L. Rev. 616, 617 n.8 (1917); Annot., Married Women's Act as abolishing estates by entireties, 141 A.L.R. 179, 202 & n.82 (1942).

Michigan amended the tenancy in 1975. See Mich. Comp. Laws Ann. § 557.71 (Cum. Supp. 1980-1981), but North Carolina, to this date, apparently has not. See Duffly, The Effect of the State Equal Rights Amendment on Tenancy by the Entirety, 64 Mass. L. Rev. 205, 206 n.7 (1979). See, e.g., *Rauchfuss* v. *Rauchfuss*, 33 N.C. App. 108, 115-116 (1977).

[15] The equal protection clause is held to require that State discrimination on the basis of sex serve "important" governmental objectives and be "substantially related" to the achievement of those objectives, see *Craig* v. *Boren*, 429 U.S. 190, 197 (1976); *Orr* v. *Orr*, 440 U.S. 268, 279 (1979); *Wengler* v. *Druggists Mut. Ins. Co.*, 446 U.S. 142, 150 (1980), while the E.R.A. holds State discrimination on the basis of sex permissible only if it furthers a "compelling" State interest with as narrow an impact as possible consistent with the compelling purpose. See *Attorney Gen.* v. *Massachusetts Interscholastic Athletic Ass'n*, 378 Mass. 342, 354 (1979); *Commonwealth* v. *King*, 374 Mass. 5, 21-22 (1977); *Opinion of the Justices*, 374 Mass. 836, 838 (1977).

view, the tenancy appeared to be a reflection of discredited stereotypes. The male was assumed competent, and thus was to have full control of the property and returns from it during his lifetime and could alien or lose all his interest in it including his survivorship right. The female was thought incompetent, and so was given no rights in the property during her husband's lifetime, and must abide his ideas of proper management, but was protected in her survivorship right against her creditors (and even against her husband and his creditors).

The theoretical support for the tenancy was the concept of the legal unity of the husband and wife, and if it turned out that in that unity the husband was dominant, this was perhaps because the stereotypes mentioned had determined the shape of the concept. *Licker* v. *Gluskin*, 265 Mass. 403 (1929), decided a half century ago, was a monument to the conventional attitudes.[16] But in recent years we have freely recognized the weakness of the "common law unity concept" as a guide to satisfactory current decision (see *DeCenzo* v. *Assessors of Framingham*, 372 Mass. 523, 526 [1977]; *Green* v. *Commissioner of Corps. & Taxation*, 364 Mass. 389, 394-395 [1973]; *Brown* v. *Boston*, 353 Mass. 740, 744 [1968]; *Osborne* v. *Lancaster*, 345 Mass. 164, 165 [1962]). And we have to recognize that inequalities in the incidents of the tenancy must put in some question its constitutional validity.[17]

---

[16] *Licker* held that the individual creditors of a wife holding under the tenancy could not attach her interest. The court said the tenancy "is founded on the common law doctrine of the unity of husband and wife as constituting in law but one person," and the estate's traditional features "continue unaffected by the modern statutes designed to ameliorate the rights of married women at common law and to render more flexible and individual the property rights of husband and wife." Because under common law a wife "could make no valid conveyance" of real estate "without the assent in writing of [her] husband," it followed that a woman could not independently alien her interest in the tenancy, nor could her sole creditors attach it. 265 Mass. at 404-407.

[17] Thus the Court of Appeals observed in *Friedman* v. *Harold*, 638 F.2d 262 (1st Cir. 1981), cited below in text, that two State interests might be advanced to justify the treatment of creditors under the tenancy: one in

This question of the constitutionality of the Massachusetts tenancy has not previously come before this court, but it has reached Federal courts in this locality. We digest in the margin the cases of *Klein* v. *Mayo*, 367 F. Supp. 583 (D. Mass. 1973) (three-judge court), aff'd without op., 416 U.S. 953 (1974); *D'Ercole* v. *D'Ercole*, 407 F. Supp. 1377 (D. Mass. 1976); *Friedman* v. *Harold*, 638 F.2d 262 (1st Cir. 1981).[18] The decisions do not overlook the aridity of the

---

protecting "innocent nondebtor spouses generally," another in protecting "husbands specifically from debts incurred by their wives." The first interest might be legitimate but was served in a "dramatically underinclusive" way by the tenancy; the second interest was so explicitly discriminatory as to be of dubious legitimacy.

We may add that, in the face of the *Licker* case (see note 16 *supra*), the immunity granted the wife could hardly be justified as intended to remedy the past effects of economic discrimination against women. Compare *Califano* v. *Webster*, 430 U.S. 313, 317-320 (1977).

[18] In *Klein*, brought under 42 U.S.C. § 1983 (1976), an estranged wife sought to partition the tenancy under G. L. c. 241, § 1, and was denied relief. The court said there was no inequality in the particular case because the husband was also forbidden partition; and the plaintiff was not attacking other features of the tenancy. True, there was no parallel female oriented tenancy, but it was not the State that compelled the parties to enter upon the present tenancy; they had chosen to do so. It might be unfair to equalize the tenancy by forcing the husband to make a gift to the wife he never intended to make.

Also under § 1983, *D'Ercole* was an action by an estranged wife attacking the husband's exclusive control of the property — incidents different from that in *Klein*. There was action by the State sufficient for § 1983 in the State's support of the tenancy by statute and decision, and the tenancy was male oriented, but the choice was the parties' at least where no duress or the like was shown. There had been heavy public reliance on this form of tenancy. Judgment went for the husband. (See also *Forbes* v. *United States*, 472 F. Supp. 840 [D. Mass. 1979], a tax case following the line taken in *D'Ercole*.)

In *Friedman*, the wife had incurred debts on which judgments had been obtained. Shortly thereafter she and her husband acquired a home as tenants by the entirety (substituting for a home they had previously held in like tenancy). The wife then filed for involuntary bankruptcy. Her trustee, on behalf of the creditors, sought and was held by the bankruptcy judge entitled to reach her survivorship interest. The bankruptcy judge thought the wife's immunity under the tenancy was insupportable under the intermediate equal protection standard applicable to claimed sex discrimination, as well as under the E.R.A. standard; and he believed

"unity" concept and its probable original basis in the contemporary ideas about the capacities of men and women. However it was suggested, particularly in the *D'Ercole* case, *supra*, that the parties seeking to attack the various aspects of the tenancy could not show final State responsibility for the deprivations claimed.[19]  This was because the parties to the tenancy had voluntarily selected that form of land holding; the State had not compelled them.  There was, indeed, no form of estate in land, readily available for selection, that replicated the tenancy by the entirety but reversed the roles therein of husband and wife, see *Klein*, 367 F. Supp. at 585; *D'Ercole*, 407 F. Supp. at 1382-1383,[20] although we suppose draftsmanship might achieve the sub-

---

the trustee was in a position to raise the constitutional question, as the creditors could not be said to have made a voluntary election as in *D'Ercole*. On review, a judge of the District Court reversed; he did not consider the question of the trustee's standing, but held that the exemption of the wife's interest from her creditors' claims did not result from a discriminatory policy on the part of the State, but rather from choice.  The Court of Appeals affirmed on the ground that the trustee did not have standing to press a claim of sex discrimination from the vantage point of a party to the tenancy; and as to the trustee's own rights, only a minimal "rational basis" test applied, and by such a test the Massachusetts tenancy might survive.  The court had "grave reservations" whether it could survive the "intermediate" equal protection scrutiny, if standing were satisfied.  The court did not consider specifically the questions that might arise from judicial refashioning of the tenancy in a retroactive sense, but suggested that any reformulation might follow the pattern of the 1980 legislation.

[19] This was not to deny that there was State action in that the State, by statute and decisional law, shaped and made available the tenancy itself. The point made was that the final responsibility lay with the parties who freely elected the tenancy.  See *D'Ercole*, 407 F. Supp. at 1381 n.8.

[20] The difficulty in framing the matching tenancy by a simple conveyance was that the survivorship or remainder interest in the husband could not be immunized against creditors.  See *Whiteside* v. *Merchants Nat'l Bank*, 284 Mass. 165, 174-175 (1933); *Clarke* v. *Fay*, 205 Mass. 228, 235-236 (1910); *Putnam* v. *Story*, 132 Mass. 205, 210-211 (1882); 2 G. Newhall, Settlement of Estates and Fiduciary Law in Massachusetts § 356, at 453 (1958); Slizewski, Trusts and Estates, 6 Ann. Survey Mass. Law 15, 24 (1959).  It was not the contingent or "expectancy" nature of the wife's survivorship in a tenancy by the entirety that gave the wife such an immunity, but rather the assumed limitations of the wife's ability to alien property at common law.  See *Licker* v. *Gluskin*, *supra*, and *Osborne* v. *Lancaster*, 345 Mass. 164, 165 (1962), explaining *Licker*.

stantive result, or something approximating it, by the use of a trust with "spendthrift" provisions.[21]  Still the joint and common tenancies, with indubitably equal rights, were available; and in any event, in the absence of proved coercion, misrepresentation, or ignorance guilefully manipulated, the parties entering on a tenancy by the entirety were making a choice of their own (and were in a position to revise the initial choice by mutual agreement thereafter). See *Klein* at 586; *D'Ercole* at 1382.

The reality of the choice is fortified by the fact that — regardless of historical origins and claims about stereotypes — tenancy by the entirety was suitable to the requirements of many married couples, and could have been and, no doubt, often was recommended to them on a quite reasonable basis.  It made sense in common situations where there was no particular concern about division of management rights, and the couple wanted assurance that the surviving spouse would take the property free and clear of any debts (including tort judgments) of the deceased spouse.  The wife had an advantage in that her survivorship could not be reached even by her own creditors.  For some years the tenancy had State inheritance tax advantages,[22] and on passage of the property upon death of either spouse probate might be avoided if the estate was otherwise small.  See M. Park, Conveyancing § 129, at 136 (1968).

---

[21] The main objective would be to restrict by spendthrift provisions the husband's power to alien his interest. See *Richardson* v. *Warfield,* 252 Mass. 518, 520 (1925); *Haskell* v. *Haskell,* 234 Mass. 442, 446-447 (1920); *Boston Safe Deposit & Trust Co.* v. *Collier,* 222 Mass. 390, 395-396 (1916).  See generally 3 G. Newhall, *supra* § 438G, at 130-134; 6 American Law of Property § 26.99, at 541 (A.J. Casner ed. 1952).

[22] Until 1949 the passage of the remainder to the surviving spouse was exempt from the tax.  In 1949 the exemption was narrowed to apply only to residential property occupied by the couple as a home.  In 1961 the same limited exemption was extended to joint tenants.  See G. L. c. 65, § 1; M. Park, Conveyancing § 129, at 136 (1968); Glendon, Tenancy by the Entirety in Massachusetts, 59 Mass. L.Q. 53, 55 (1974).  But as of 1976 the exemption for joint tenants and tenants by the entirety was eliminated.  See G. L. c. 65C (special note); M. Park, *supra,* § 129, at 42 (1978 Supp.).

On the issue of voluntary choice, comparison is invited with the situation in *Kirchberg* v. *Feenstra*, 609 F.2d 727 (5th Cir. 1979), prob. juris. noted, 446 U.S. 917 (1980). The case can be put schematically thus. By Louisiana statute law, the husband was established as "head and master" of property — we deal here with real property — held in community with his wife, and he was accorded the exclusive right to manage and alien it. But if the wife desired equality with her husband in these respects she could enter originally into an antenuptial contract with him in that sense, or, later, at any stage of the marriage, secure such equality for the future by recording an appropriate instrument as set out in the statute. 609 F.2d at 732. This arrangement, according to the court, involved unconstitutional State action. Standing alone, the provision presumptively giving the husband control could not stand: this would be sex based discrimination by the State. The official discrimination was in some degree mitigated, but it was not eliminated, by according the wife an opportunity to overcome the presumptive arrangement by asserting herself and taking positive action. The State was violating equal protection even though the "burden" (including expense) laid on the wife to claim equality was not "insurmountable." *Id.* at 733-734.[23] As a practical matter, in many cases the statutory expedient open to the wife would be a dead letter because of simple lack of knowledge that it existed; there would be no real choice. *Id.* at 733 n.14. See, as an instance of wife's ignorance, *Corpus Christi Parish Credit Union* v. *Martin*, 358 So. 2d 295, 297-298 (La.), cert. denied, 439 U.S. 897 (1978).

With respect to choice, our case of the Massachusetts tenancy was more defensible constitutionally than the Louisiana statute because the Commonwealth did not

---

[23] For this proposition the *Kirchberg* court relied on *Trimble* v. *Gordon*, 430 U.S. 762, 773-774 (1977) (Illinois statute which allowed only legitimate children to inherit from intestate father involved unconstitutional discrimination against illegitimates; fact that father could provide for illegitimates by will had no "constitutional significance").

create an unequal situation from which a wife had to extricate herself; such inequality as inhered in our case was brought about initially, if at all, by choice which, as we have said, need not have been artificial. In fairness we should add that the existence of a category of estate associated with the husband-wife relation might lead to some unthinking or mechanical use of that form in conveyances to married couples (see *Fuss* v. *Fuss* [*No. 2*], 373 Mass. 445, 447 [1977]; Glendon, Tenancy by the Entirety in Massachusetts, 59 Mass. L.Q. 53, 59 [1974]), and until 1973 there was an evidential presumption that a conveyance to husband and wife was to them as tenants by the entirety (but the presumption could be overcome by proper language in the conveyance).[24]

4. *Concerning possible relief.* Let us now assume for argument's sake a vulnerability in the Massachusetts tenancy and consider what if any relief might be appropriately provided in the particular cases or the generality of cases. Relief applicable to past tenancies would not follow automatically from a finding of unconstitutionality, for, as the Court said in *Chicot County Drainage Dist.* v. *Baxter State Bank,* 308 U.S. 371, 374 (1940) (aptly referred to by the *Kirchberg* court): "The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects, — with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute [in our present case, a mixture of statute and long established decisional law] and of its previous application, demand examination."

To take a preliminary look at the cases at bar: With regard to *McDougall*, the element of voluntary choice on

---

[24] The presumption, e.g., *Hoag* v. *Hoag,* 213 Mass. 50, 53 (1912), was removed by St. 1973, c. 210, § 1 (amending G. L. c. 184, § 7), applicable to conveyances and devises made after its effective date.

the given facts might be thought so real as to shut off constitutional demands, whatever position was taken on the general class of cases. Here the entire fee of business property was in Mrs. McDougall by force of the transfer to her individually and she then by her deed elected the tenancy in haec verba (see n.24), by which she may be taken to have relinquished willingly to her husband the current control of the property, including the matter of rental.[25] *West's* case has the appearance of a tenancy of the more usual sort, not out of keeping with a standard situation. The tenancy was entered into in 1954 and generated about it a web of relationships. The wife is not prepared to relinquish her survivorship or the immunity of the tenancy from her debts, but balks at another incident, the burdening of the current tenancy by the husband's obligations. She argues for an equality retrospectively imposed, but equalization could very rationally take a form that would not relieve the husband's interest of levy by his creditors, but would rather subject the wife's interest to her own creditors. See n.27 below. See also *Newman* v. *Chase,* 70 N.J. 254, 260 (1976); *King* v. *Greene,* 30 N.J. 395, 412-413 (1959).

But the question of possible relief should be considered more broadly. As noted, the parties make no claim that the 1980 legislation applies (retroactively) to their cases. That legislation covers conveyances from and after February 11, 1980.[26] It amended G. L. c. 209, § 1, to provide: "A hus-

---

[25] The master found that Joan McDougall had little connection with the McDougall businesses, including S & S, and hence rarely even visited the Dutton Street property.

[26] The present cases do not call upon us to decide whether the legislation can apply also to transactions after February 11, 1980, relating to the tenancies existing on that date. For opinion that only post-February 11, 1980, conveyances are affected, see D. Park, The New Tenancy by the Entirety: More Questions than Answers, 8 Mass. Law. Weekly 367 (1979); 1979 Legislation Affecting Real Property, 15 Real Prop., Prob. & Trust J. 281, 291 (1980). As to legislative history on the question, the following may be of interest: 1979 House Doc. Nos. 840, 1592, 1613, 6564, 6740; 1979 House J. 1635, 1815, 1898; 1979 Senate J. 1305-1306, 1318, 1614, 1635.

As to the due process questions that might arise regarding legislative

band and wife shall be equally entitled to the rents, products, income or profits and to the control, management and possession of property held by them as tenants by the entirety." And further: "The interest of a debtor spouse in property held as tenants by the entirety shall not be subject to seizure or execution by a creditor of such debtor spouse so long as such property is the principal residence of the non-debtor spouse" (with a proviso regarding liability of the spouses for necessaries). From these provisions the whole shape of the new tenancy will be extrapolated.

Any "equalization" of the rights of spouses by decision of this court as to conveyances antedating February 11, 1980, would pose formidable problems as to the starting date. It is not clear that selection of the date of the E.R.A. would be anything more than arbitrary in view of equal protection claims. In delineating the changed rights, the court would be faced with choosing among multiple patterns of equalization that have been attempted around the country in modifying tenancies by the entirety (it is a notable fact that the statutory changes have generally been wholly prospective, see Annot., Retrospective operation of legislation affecting estates by the entireties, 27 A.L.R.2d 868, 870-872 [1953]; Annot., Married Women's Act as abolishing estates by entireties, 141 A.L.R. 179, 181 & n.12 [1942]). The very variety of the patterns, as indicated in the margin,[27] sug-

---

diminishment of a husband's rights in an existing tenancy, compare Duffly, The Effect of the State Equal Rights Amendment on Tenancy by the Entirety, 64 Mass. L. Rev. 205, 213-214 (1979); Note, Retroactive Application of California's Community Property Statutes, 18 Stan. L. Rev. 514, 521-522 (1966), with Pascal, Louisiana's 1978 Matrimonial Regimes Legislation, 53 Tulane L. Rev. 105, 127-128 (1978). Cf. *Opinion of the Justices*, 337 Mass. 786, 789 (1958) (Legislature can abolish existing dower and curtesy rights because such rights are a mere expectancy or possibility).

[27] A suggestion of the diversity appears from the following which omits many differences of detail. Some States have equalized rights by giving the spouses essentially a tenancy in common with an indestructible right of survivorship. Each spouse can alien, and his or her individual creditor attach, both the individual's present possessory and future survivorship in-

gests that the process of selection is more suitably done by the Legislature than by a court. Something might of course be said here for trying, by hindsight, to align a judicial choice with that actually made by the Legislature in the 1980 statute. See *Friedman* v. *Harold, supra,* 638 F.2d at 269. However we have doubts whether it would be appropriate thus to install a "principal residence" exemption, and there is serious trouble with the fact that the Legislature itself has not indicated — surely not expressly — that it intended retroactive reform (see n.26). The further, grave objection to going backward to tenancies created by past conveyances is that it would upset expectations and defeat reliances based on a long established form of conveyance used in thousands of transactions, not all of which were of the family type, as the record in *McDougall* shows. There would be other aspects of unfairness. The retroactive "equalization" of rights could amount to forcing a party to make a never intended and quite possibly unmerited gift to another. See *Klein* v. *Mayo, supra,* 367 F. Supp. at 585. Retroactive alteration of the law is strongly contraindicated when the subject is settled rules of property. See Currier, Time and Change in Judge-Made Law: Prospective Overruling, 51 Va. L. Rev. 201, 242-243 (1965); Traynor, Quo Vadis, Prospective Overruling: A Question of Judicial Re-

---

terests. See Phipps, Tenancy by Entireties, 25 Temple L.Q. 24, 31 (1951); Huber, Creditors' Rights in Tenancies by the Entireties, 1 B.C. Comm. & Indus. L. Rev. 197, 201 (1961) ("all interests reachable rule"). Other States have taken equalization of rights to the other extreme. Spousal rights are truly joint since neither spouse can individually alien (or his or her individual creditors attach) any interest, present or future, in the property. See Phipps, *supra* at 32; Huber, *supra* at 202-204 ("no interests reachable rule"). A third, intermediate solution permits only joint alienation by the spouses of present rights in the property, but allows alienation by each spouse of his or her survivorship interest. Creditors may attach present interests only on joint obligations of the spouses; they can attach the survivorship interest of each for individual obligations. See Phipps, *supra* at 32; Huber, *supra* at 204-205 ("right of survivorship reachable rule"). See generally Phipps, *supra* at 46-57 (chart detailing rules adopted in various States).

sponsibility, 28 Hastings L.J. 533, 543 (1977); R.E. Keeton, Venturing to Do Justice 34, 40-41 (1969).

Thus we conclude that a decision by us on constitutional grounds would be prospective and would affect only tenancies created after the issuance of our decision; and relief would be denied in both our cases. Cf. *Rosenberg* v. *Lipnick*, 377 Mass. 666, 671 (1979).[28] In fact the 1980 legislation has come in ahead of a decision on those lines, and has brought in changes from February 11, 1980, but not such as to cover the instant cases.

The judgment in the *West* case will be affirmed, and any outstanding stay vacated. The *McDougall* appeal will be dismissed (see n.7).[29]

*So ordered.*

---

[28] In the *Kirchberg* case, the decision of unconstitutionality was rendered on December 12, 1979, anticipating by nineteen days the effective date of legislation (January 1, 1980) which evidently requires the concurrence of both spouses for future alienation of real property held in community. See *Kirchberg*, 609 F.2d at 730 n.2; La. Civ. Code art. 2347 (West Supp. 1980). The court gave its decision prospective effect, apparently covering transactions for the nineteen days. It is not entirely clear whether the particular past transaction at bar was covered, but if so it could be as a kind of reward for prompting the decision anticipating the legislation. (It may be observed, incidentally, that the "equalization" brought about by the decision and the legislation was relatively simple and modest: it seems to require actual rather than presumed consent of the wife for future real property transactions. And community property law starts with a notion of shared ownership in the spouses quite different from the ownership in tenancy by the entirety. Cf. 2 American Law of Property § 7.1, at 121 [A.J. Casner ed. 1952].)

[29] We need not consider whether the husband should have been joined as a party to either of the actions at bar because in neither case does the disposition affect the husband's interest adversely. See *Klein* v. *Mayo*, *supra*, 467 F. Supp. at 586 n.4. Cf. *Krokyn* v. *Krokyn*, 378 Mass. 206, 216 (1979).