# Ellen Cooper *vs.* J. Phillip Cooper.

No. 95-P-1623.

Middlesex. February 7, 1997. - June 25, 1997.

Present: Kass, Greenberg, & Flannery, JJ.

*Divorce and Separation,* Alimony, Separation agreement. *Contempt.*

In contempt proceedings in Probate Court for the failure of the husband to comply with court orders for payment of alimony, the judge correctly considered the husband's potential earning capacity in evaluating his ability to purge himself of contempt [53-54], properly rejected the husband's claim of impoverishment where the evidence permitted a finding that it was self-imposed [54-55], and properly considered the income and assets of the husband's present wife in calculating the husband's present ability to pay alimony [55-56].

In contempt proceedings in Probate Court for the husband's nonpayment of alimony, the judge correctly found that the parties' separation agreement and a later stipulation incorporated into a modified judgment prohibited the husband from seeking a reduction in alimony payments based upon a change in his employment. [56-57]

In a contempt proceeding in Probate Court in which the husband, represented by counsel, did not request an evidentiary hearing, the judge properly decided the matter on the materials submitted and there was no denial of due process. [57]

Complaint for divorce filed in the Middlesex Division of the Probate and Family Court Department on June 12, 1987.

Complaints for contempt filed on December 19, 1991, and August 31, 1995, respectively, were heard by *Judith Nelson Dilday*, J.

*David E. Cherny* (*Matthew W. Perkins* with him) for J. Phillip Cooper.

*Richard D. Packenham* for Ellen Cooper.

Greenberg, J. These are appeals from two judgments of contempt entered in a Probate Court, for failure of the

husband, J. Phillip (Phillip),[1] formerly married to Ellen, to comply with court orders for alimony. A Probate Court judge issued the first ruling on May 31, 1995, following an evidentiary hearing. Determining that Phillip was in contempt of a monetary order, she fixed the amount of the arrears and ordered him to pay within 90 days.[2] Phillip appealed from the order, and without obtaining a stay, he failed to pay the amount due.

Ellen filed a new complaint on August 31, 1995. After hearing arguments of counsel, on September 6, 1995, the same judge again found Phillip in contempt and sentenced him to jail for 30 days until he purged himself by payment of one-half of the newly accrued arrears.[3] After one week in custody, Phillip paid $12,190.42 and was released on September 13, 1995. He appeals from both judgments which hold him in contempt for nonpayment of alimony arrears that aggregate $51,790. The cases have been consolidated for purposes of this appeal.

The circumstances are these. When Phillip and Ellen married in 1967, she worked as a homemaker as he was beginning his career. From the start, she was the primary caretaker of their now adult daughter and twin sons. She cared for Phillip and supported his business endeavors. Eventually, Phillip earned a doctorate from the Massachusetts Institute of Technology and became executive vice-president of Standard & Poor Corporation, a national financial service and bond rating firm. After Ellen became pregnant with their first child, she did not work outside of the home. During their marriage, the Coopers maintained a prosperous lifestyle.

Between 1988 and 1993, Phillip held successive jobs as chief executive officer of two corporations. By the time he left his last post, before starting his own business, his annual salary had reached $169,000. He resigned from Standard and Poor in 1988, about one year after the breakup of his marriage. By that time, he had married Miriam Flicop Cooper

---

[1]We intend no disrespect by the use of first names, but employ them in the interest of clarity.

[2]The Probate Court judge found Phillip in contempt for nonpayment of $39,599.51 in her May 31, 1995, decision. That arrearage represented a year's accumulation from February 1994.

[3]The judge found Phillip in contempt for nonpayment of an additional $24,381.84, and ordered him to pay Ellen $12,190.42 by September 8, 1995.

(Flicop). She is senior vice president of Client Services Corporation and earns over $200,000 annually. They have one child together.

Phillip challenges the contempt orders as improperly resting on an exaggerated estimate of his ability to pay. He asserts that the judge erred in: (1) considering his potential earning capacity; (2) failing to consider liens on his assets; and (3) considering the assets and income of his current spouse. In addition, Phillip contends that the judge erroneously concluded that the parties' separation agreement bars him from seeking reduced alimony payments. We affirm.

1. *The husband's potential income.* A review of the judge's findings reveals that she considered Phillip's potential earning capacity in evaluating his ability to purge himself of contempt. A judge may consider future earnings as long as, with reasonable effort, the responsible spouse could generate an income greater than that being earned at the time of the contempt hearing. *Schuler* v. *Schuler*, 382 Mass. 366, 373-374 (1981). Ability to pay alimony includes all forms of income and capital assets a spouse possesses. *Krokyn* v. *Krokyn*, 378 Mass. 206, 210 (1979). Phillip complains that the judge overestimated how much income he could generate from a business he started in November, 1993, when he left his last salaried position. Phillip incorporated his new venture, Road Runner Medical, Inc., in 1994. His present wife, Flicop, is the sole shareholder.

Having heard Phillip's testimony explaining that he spent the summer of 1994 organizing the new venture, and invested a lot of time and "sweat equity" without drawing a salary, the judge was not bound to accept his view that the enterprise was worthless until capitalized. See *Heistand* v. *Heistand*, 384 Mass. 20, 27 (1981). We are unimpressed by Phillip's contention that the judge's findings on this point are not sufficiently specific. Courts consider potential earning power if, with reasonable effort, the spouse might eventually realize that power's potential worth. *Schuler*, 382 Mass. at 373-374. See also *Thomsen* v. *Thomsen*, 12 Mass. App. Ct. 1010 (1981) (the husband's corporate advertising agency's pattern of growth could be taken into account). Contrast *Goldman* v. *Goldman*, 28 Mass. App. Ct. 603, 613 (1990), wherein future events could not be predicted with any measure of certainty. Here, the judge found that "a business plan and prospectus

have been distributed to investors, with a potential of a [three] million dollar investment." She found that Phillip had been actively marketing the business at the time he ceased making alimony payments. In addition, Phillip testified that he expected to earn from this venture an amount equal to or greater than his last salary of $160,000.

Phillip relies heavily upon *Flaherty* v. *Flaherty*, 40 Mass. App. Ct. 289 (1996). In *Flaherty*, the husband had lost his job — involuntarily — before divorcing his wife, fell behind in his child support payments while unemployed, and was "making a reasonable effort to secure additional income." *Id.* at 291. We reversed the judge's contempt order because the facts ineluctably demonstrated the husband's inadequate assets and the involuntary nature of his penury. In contrast to the actions of the husband in the *Flaherty* case, Phillip's decision to initiate a new venture, as opposed to securing a salaried position, was voluntary.[4] In addition, his failure to pay was not due to his plight before the divorce, as in *Flaherty*, but rather to his failure to make agreed alimony payments despite the availability of funds from other sources.[5] The judge did not err in considering Phillip's potential earnings.

2. *Availability of other assets.* Phillip contends that a mortgage and Federal tax lien encumber his only asset of significant value, his interest in the marital home, thereby rendering it unavailable to satisfy the judgment. He derives no income from this property.

Taken in isolation, Phillip's argument is plausible. When, however, the focus is on his machinations, we think that the

[4]The judge found that in 1994 Flicop became the sole stockholder of Phillip's newly formed business corporation. This was done, Ellen theorized, because Phillip wanted to shield his potential earnings from further garnishment by the IRS and to avoid paying alimony. At the time of the second contempt hearing, the IRS held a $1.5 million lien on all property owned by Phillip and Flicop. The lien resulted from a tax liability incurred after an audit of the Cooper's joint 1979-1982 Federal income tax returns.

[5]For example, the judge found that "[d]uring the tax year 1994, the husband received $79,000 in a severance package from [his last employer], $8,000 from Apex, Inc. and $15,520 in unemployment insurance for a total of $102,520 . . . admittedly not reported on his [Probate Court] financial statement." Ellen never received any of this money despite Phillip's assurances in a letter he sent her after leaving his last salaried position in the fall of 1993.

judge could rightly consider this property as an asset. It would be manifestly unfair to permit him to hide behind the IRS lien, and his transfer of the home into Flicop's name, to evade his obligation to Ellen.

As the court said in *Krokyn*, 378 Mass. at 213-214, "[c]ommon sense and basic concepts of fairness support the notion that ownership of a valuable asset demonstrates ability to pay without further inquiry as to whether payment can be enforced directly against the asset. . . ." In addition, "[t]he law does not require that an obligor be allowed to enjoy an asset — such as a valuable home or the beneficial interest in a spendthrift trust — while he neglects to provide for those persons whom he is legally required to support." *Id.* at 214. We think, therefore, that the judge did not abuse her discretion in rejecting Phillip's claim of impoverishment because the evidence permitted a finding that it was self-imposed.

We are further fortified in our view because the judge's findings make clear that the marital home was not the only asset she considered when issuing the contempt order. The judge noted that Phillip: transferred a New Hampshire home to Flicop and his children; established an educational trust for his daughter with $18,000, naming Flicop as cotrustee; transferred $11,500 to Flicop; transferred a boat to Flicop; and gave Flicop a lump-sum payment of $19,000.

3. *The husband's present wife's income.* Phillip asserts that because Flicop has no duty to pay alimony, the judge erred in factoring her income and assets into the calculation of his ability to pay. A Probate Court judge may consider the income or assets of a second spouse. See *Silvia* v. *Silvia*, 9 Mass. App. Ct. 339, 342 (1980); *Matteson* v. *Matteson*, 23 Mass. App. Ct. 945-946 (1986). Phillip is correct that a second wife does not share the duty to obey a support order directed against her spouse. *Krokyn*, 378 Mass. at 215. However, because the income of a second spouse contributes to the support of the current household, the obligated spouse has more of his or her own money with which to satisfy alimony. See *Sylvia*, 9 Mass. App. Ct. at 342.

There is ample support in the record to indicate that Phillip had use of the assets he transferred to Flicop. In 1994, when Phillip stopped alimony payments, he maintained a lavish lifestyle with Flicop while Ellen was barely making mortgage payments on her home. These circumstances permitted the

judge to scrutinize all of the husband's sources of income because "absent good reason, in a long term marriage, there is no justification for the lifestyle of one spouse to go down while the other remains high." *Goldman,* 28 Mass. App. Ct. at 611.

4. *The separation agreement.* Phillip challenges the judge's finding that the parties' separation agreement prohibits him from any future modifications of alimony due to his employment. If the language of an agreement leaves any doubt as to its ordinary meaning, the court will "examine the subject matter of the agreement and the language employed, and will attempt to ascertain the objective sought to be accomplished by the parties." *Parrish* v. *Parrish,* 30 Mass. App. Ct. 78, 86 (1991). Construction of the agreement will be guided by "[j]ustice, common sense and the probable intent of the parties . . . ." *Kotler* v. *Spaulding,* 24 Mass. App. Ct. 515, 517 (1987). Because the intent with which a person acts is a finding of fact, the trial judge's finding must stand unless unsupported by any reasonable view of the evidence. *Casey* v. *Gallagher,* 326 Mass. 746, 748-749 (1951). We find no clear error in the judge's determination.

On June 11, 1987, the parties, both represented by counsel, executed a separation agreement which made comprehensive provisions for alimony, child support and property division. The agreement was to "survive as an independent agreement" after their divorce. The agreement included a provision that permitted Phillip the "opportunity to accept employment which is more consistent with his career goals than his present position." The parties recognized the possibility that in the future Phillip might "receive substantially less compensation than [he] currently receives." Such a change of circumstances would result in a grace period of reduced alimony, with provision for retroactive payment, when his "compensation returns to or exceeds the compensation immediately prior to the initial reduction."

In 1989, Phillip changed jobs, accepting a position with a lower salary. Pursuant to the agreement, the parties reduced the amount of alimony. At the same time, the parties stipulated that Phillip could not avail himself of the job change provision in the future. On June 17, 1989, this compromise was incorporated into a modified judgment.

The Probate Court judge's finding was reasonable. She read

the language of their 1989 agreement to preclude future reduction based upon change in Phillip's employment. His present effort to achieve modification was, thus, barred by the limitation imposed by the separation agreement itself.

5. *The September contempt hearing.* Phillip's final contention is that he could not be found in contempt without an evidentiary hearing. However, he did not request a hearing. If all materials germane to the decision are submitted to the judge, and an opportunity to have an evidentiary hearing is not foreclosed, no denial of due process occurs. See *Reynolds* v. *Whitman*, 40 Mass. App. Ct. 315, 321 (1996). The judge, who had heard diverse testimony at the earlier February, 1995, hearing, and who had remained assigned to the case, gave the husband's counsel ample time to consult his client, to request a further hearing, or to make an objection. There was no arbitrary denial of any right to be heard on whether Phillip had the ability to comply with her previous order. See *Dominick* v. *Dominick*, 18 Mass. App. Ct. 85, 87 (1984).

*Judgments affirmed.*