JUDITH S. HUDDLESTON *vs.* JAMES I. HUDDLESTON.

No. 98-P-1226.

Essex. November 8, 2000. - May 14, 2001.

Present: PORADA, LENK, & DUFFLY, JJ.

*Divorce and Separation,* Alimony, Separation agreement, Modification of judgment.

A Probate Court judge's modification of a divorce judgment terminating alimony payments paid by a former husband upon his reaching the age of sixty-five years, terminating his obligation to carry life insurance on his life, and eliminating annual cost of living increases to alimony previously awarded his former wife, failed to give appropriate consideration to the parties' merged separation agreement reflecting a contrary intent, and to the absence of circumstances that would have otherwise warranted the modification. [568-572]

COMPLAINT for divorce filed in the Essex Division of the Probate and Family Court Department on June 22, 1978.

A complaint for modification, filed on July 11, 1995, was heard by *John C. Stevens III,* J.

*Elizabeth A. Zeldin* for Judith S. Huddleston.

*Richard A. Gould* for James I. Huddleston.

DUFFLY, J. Judith Huddleston (Judith) appeals from a modification judgment entered by the Probate and Family Court terminating alimony payments paid to her by James Huddleston (James) upon his reaching the age of sixty-five, terminating James's obligation to carry life insurance on his life, and eliminating a cost of living adjustment. We agree that in light of language in the parties' merged separation agreement reflecting a contrary intent, and the absence of circumstances otherwise warranting the modification, these orders should not have been made.

*Background facts and proceedings.* "Bearing in mind the

weight to be accorded the exercise of the probate judge's sound discretion, we review the record in its entirety." *Schuler* v. *Schuler*, 382 Mass. 366, 371 (1981). This record includes findings issued by other probate judges in connection with prior modification judgments that provide facts about the parties' circumstances. Some of these findings were incorporated by the probate judge in the findings relative to the instant case, and we refer to other findings as we deem appropriate to our discussion of the issues before us.

James, who had previously been married, and Judith, who had not, were married on February 14, 1970. They had three children who, at the time of the 1978 divorce, were seven, four, and three years old. Following the divorce, James, a self-employed orthopedic surgeon, remarried and moved to Florida.[1] Judith, the primary, and then sole, custodial parent of the parties' three children, has not remarried.

The judgment of divorce nisi that entered on August 23, 1978, incorporated and merged the parties' separation agreement[2] and was found to be fair and reasonable by a Probate Court judge. The agreement not only detailed the amounts of support to be paid by James to Judith but also set forth the terms and conditions of annual cost of living increases (based on the consumer price index or James's income, whichever was less); the specific circumstances warranting increases beyond the annual cost of living adjustments, or a downward adjustment; the amounts by which support would be reduced upon the happening of anticipated events; and the duration of support.

The agreement provided that support would be paid "during the joint lives of the parties" and will cease upon Judith's remarriage. James was initially obligated to pay the monthly

---

[1]As of the date of trial, he was still married to the new spouse. They have no children.

[2]When an agreement merges, and does not survive the judgment as an independent contract, a party seeking modification need not demonstrate more than a "material change of circumstances" since the earlier judgment. *Harris* v. *Harris*, 23 Mass. App. Ct. 931, 932 (1986), quoting from *Stansel* v. *Stansel*, 385 Mass. 510, 515 (1982).

sum of $2,500[3] as undifferentiated alimony and child support.[4] Other provisions obligated James to pay college and medical costs of the children. He was to maintain a $200,000 life insurance policy on his life.[5] Under the agreement, the children were to reside primarily with Judith, subject to scheduled visits with James.

During the ensuing years, Judith sought, and twice obtained, modifications to the judgment. First, in December 25, 1985, Judith was awarded sole legal and physical custody of the children; payments of undifferentiated alimony and child support were increased to $5,375 per month; and James was ordered to pay the costs of the parties' daughter's attendance at the Landmark School.[6]

The 1985 findings supporting an increase reflect that James's income from his professional corporation immediately following the divorce far exceeded the $80,000 in annual earnings that he anticipated he would earn as a result of his "reduced pace." There were significant increases in income earned by James in each year following the divorce, from $155,850 in 1980 to $352,240 in 1984. In 1984, support payments to Judith represented only 12 percent of James's income, whereas the

[3]The support arrangements set forth in the parties' separation agreement reflected James's stated "inten[tion] to resume his practice [following surgery] at a reduced pace with a consequent decline in income" and were "predicated on an assumption that the Husband's annual Adjusted Gross Income (without adjust[ing] . . . for alimony) is or will be about $80,000." Agreement, Article II, A(6).

[4]As set forth in findings entered in connection with the modification judgment dated December 25, 1985, the provision that alimony and child support was to be undifferentiated allowed James to take advantage of favorable tax treatment pursuant to "applicable provisions of the Internal Revenue Code as in effect in 1978," whereas Judith would be obligated to report the payments as taxable income to her. Because support is undifferentiated, we refer to it as "support," or, following emancipation of the children, as "alimony."

[5]Regarding property division, the agreement provided that the parties' Marblehead home would be fixed up and sold, the proceeds to be divided equally between the parties. The parties agreed they had divided their personal property, and a schedule attached to the agreement lists such things as "Jim's clothes," rugs, furniture, and the like which were to belong to James. Judith would keep her 1975 Buick.

[6]The findings reflect that the child attending the Landmark School has a learning disability, that the parties agreed that she should attend the Landmark School, and that she had made good progress there.

initial support obligation represented some 40 percent[7] of his assumed $80,000 in annual income.

On January 18, 1991, pursuant to Judith's complaint, a modification judgment entered increasing support to $7,000 per month. The judgment further provided that future cost of living increases would henceforth be based solely on increases in the consumer price index, without reference to James's income. As set forth in the January, 1991, findings, there had been no cost of living increase included in any support paid by James since the December, 1985, judgment. James's income had increased to $432,737 in 1986, $441,297 in 1987, and $434,397 in 1988. Although the practice grossed more in 1989 and 1990 than in any year since 1984, James paid himself less in salary during those years. James's wife Dorothy had become employed by James's professional practice in 1988 and was compensated at the rate of $65,000 per year, an amount considered reasonable in view of her services. James continued to make contributions to his pension and profit sharing plans in the amount of $30,000 annually, a practice begun in 1984. As of January, 1990, the plans had a value of $1,002,174.

The January, 1991, findings also note that Judith had made no serious efforts to become employed since December, 1985; that she listed her occupation as "apprentice designer," but earned no income from this endeavor; and that she engaged in a pattern of deficit spending that, in the view of the probate judge, obligated Judith "to find a way to attempt to meet her financial commitments by supplementing the support paid to her by James." The judge found that "Judith has not actively sought employment because she has been involved in her children's education and activities." There were no findings reflecting Judith's education, work experience, or capacity for remunerative employment.

Apparently as a result of provisions in the parties' agreement, the $7,000 in monthly support being paid by James as a consequence of the January, 1991, modification judgment was reduced when the youngest child was emancipated and, as of

---

[7]Based on James's figures it was 42.48 percent; based on Judith's it was 36.67 percent.

February, 1997, James's alimony payment was $3,385.34 per month.

Judith filed the within complaint for modification on July 11, 1995, requesting an increase in alimony, as well as security for the payments. As subsequently amended, Judith's complaint also sought to have her named as beneficiary of a $50,000 life insurance policy on James's life,[8] and attorney's fees. James filed a counterclaim seeking to reduce support payments and to eliminate the cost of living adjustment, but on October 14, 1997, his counterclaim was dismissed by agreement of the parties.

On February 9, 1998, following a trial, a modification judgment entered that ordered James to "continue to pay to Judith, $3,385.34 per month as alimony payable on the first day of each month until the death of either party, until Judith remarries or until James attains age 65, whichever first occurs." The judgment vacated the "requirement for further adjustments based upon the consumer price index" and the change of circumstances provisions of Article IIA (7) (see note 10, *infra*) of the agreement, and ordered that, except as provided by the modification judgment, there would be no further adjustments in the amount of alimony. The judgment terminated James's obligation to provide life insurance and ordered that $120,000 be set aside by James and held in escrow as security for his alimony obligation, but provided that the escrowed funds could "be drawn on solely for the purposes of paying the alimony obligation as set forth" in the judgment.

On appeal, Judith's claims fall generally into three categories. She first claims that the issue of alimony reduction was not before the court because James dismissed his counterclaim; second, even if properly before him, the probate judge abused his discretion when he ordered that alimony would terminate upon James attaining age 65, in light of the parties' expressed contrary intention that support continue during the parties' lifetimes, until Judith's remarriage; and third, the findings do not support a durational limitation on the alimony obligation.

We agree that the parties' agreement clearly articulates the

---

[8]James had allowed the policy to lapse when all three children became emancipated.

parameters that the parties intended would be applicable to a modification of James's support obligation, and that the trial judge should have considered the parties' intent along with relevant changes in their circumstances when deciding the issue. We therefore do not reach the question whether, in the circumstances of this case, the probate judge properly exercised his broad discretion to entertain claims not specifically set forth in pleadings before the court. See, e.g., *Graham* v. *Quincy Food Serv. Employees Assn.*, 407 Mass. 601, 615 (1990) (full argument of claim by both parties at trial constitutes implied consent to the court's consideration of it).

*Discussion.* "The judge reported his findings, and we have a transcript of all the evidence. Accordingly, 'the appeal brings before us all questions of law, fact, and discretion.' " *Bercume* v. *Bercume*, 428 Mass. 635, 644 n.20 (1999), quoting from *Krokyn* v. *Krokyn*, 378 Mass. 206, 208 (1979). We review the findings to determine whether the judge gave appropriate consideration to the parties' intentions as expressed in their written agreement, *Bercume* v. *Bercume*, *supra* at 644, and to any changes in their circumstances since the last modification judgment. *Schuler* v. *Schuler*, 382 Mass. 366, 368 (1981); *Harris* v. *Harris*, 23 Mass. App. Ct. 931, 932 (1986).

The probate judge's findings focus on Judith's failure to budget wisely and to look for work. Regarding her spending habits, the judge took note of the fact that Judith, who had purchased the parties' twelve-room Marblehead home by paying James his one-half share of the value following the divorce, sold the home in 1996, receiving net proceeds in the amount of $241,697. She used $42,000 from the proceeds to purchase a one-bedroom condominium, financing the $100,000 balance, and expended substantially all of the remaining amount on debts and living expenses; she had $100 left at the start of trial. Judith had received and spent significant sums from a former fiancé. The findings detail Judith's lack of consistent employment, and in this regard the judge states that it does not "appear

that Judith has been more than minimally and occasionally motivated to find gainful employment."[9]

Based on these findings, the probate judge concluded that "[h]ad Judith managed her funds in anything approaching a responsible manner . . . she could easily have set aside sufficient funds to provide modest financial security for her future. She chose not to do so and continues to live beyond her means . . . ." He further concluded that, although one purpose of alimony is to provide economic support to a dependent spouse, "that does not mean that the payor should forever remain obligated to furnish such support for a recipient who chooses to remain dependent by avoiding gainful employment and dissipating her assets over a lengthy period of time."

By providing that support would continue until Judith remarried, or upon the death of either party, the parties' agreement clearly expressed their intent that it would be paid to Judith regardless of James's age or retirement status. That the parties further intended that the agreed-to support and its duration were obligations independent of Judith's employment status is evidenced by their agreement that Judith's employment would not trigger a reduction in support, but would only be a "factor" in the event Judith sought a modification as distinct from the annual cost of living increase in the support award.[10]

"Where an agreement does not survive, it is nevertheless appropriate for a judge to take heed of the parties' own attempts to negotiate terms mutually acceptable to them. A judge who

---

[9]The probate judge found that in the years since the 1991 modification, Judith worked at various jobs including as a volunteer hostess for the America's Cup races and as a photographer's apprentice. She was injured while employed as a ski instructor; while she continued to suffer from pain as a result of her injuries, the judge found that she did not suffer from any medical conditions that precluded her from gainful employment. She "has worked both gainfully and as a volunteer for political candidates in raising large amounts of funds."

[10]The agreement, at Article IIA (7), "Change of Circumstance," provides that Judith "may be employed without invoking the provisions of this paragraph to seek any reduction in [James's] payments, but any such income would be a factor to be considered if [Judith] were seeking any modification against [James]." This paragraph also sets forth those events that would entitle Judith to seek an upward adjustment in support, including "a substantial increase in the Husband's income or any other occurrence of any other contingency rendering the amounts payable by the Husband hereunder inadequate for the children or Wife."

modifies a divorce judgment does not write on a tabula rasa. To the extent possible, and consistent with common sense and justice, the modified judgment should take into account the earlier, expressed desires of the parties." *Bercume* v. *Bercume,* 428 Mass. at 644.[11] There is nothing in the agreement, or in any of the findings in the record on appeal, to suggest that the parties intended that Judith should eventually become self-supporting and that James's obligation to support her would at that point come to an end. Nor do the findings reveal anything in Judith's educational background or work experience that would have prepared her to be fully self-supporting now that the children are grown. In these circumstances, Judith's failure to become self-supporting is not a change in circumstances on which a modification may be based.

James's retirement and his reaching age sixty-five are also not bases for terminating alimony. The factors to be considered in a downward adjustment, as provided by the terms of the agreement, are whether James has suffered "[a] protracted illness, serious financial revers[al]s, or the occurrence of any contingency or substantial expense (not including remarriage) rendering the amounts payable by him . . . unduly burdensome." The findings reflect no material change in

[11]We do not agree with James that *Bercume* creates new precedent and should not be applied to this case, as it was decided before *Bercume* was released. Even if the principles espoused constituted a new rule, the factors to be considered in determining whether such a rule ought to be applied retroactively do not preclude retroactive application here. These factors are: "(1) whether a new principle has been established whose resolution was not clearly foreshadowed; (2) whether retroactive application will further the rule; and (3) whether inequitable results, or injustice or hardships, will be avoided by a holding of nonretroactivity." *Keller* v. *O'Brien,* 425 Mass. 774, 782 (1997). *Bercume* does not limit the application of its holding to future cases and notes that recognition of the public policy favoring survival of agreements set forth in earlier opinions also supports the notion "that a judge should respect 'the desire[s] of the parties to determine their destinies,'" *Bercume* v. *Bercume,* 428 Mass. at 644, quoting from *Moore* v. *Moore,* 389 Mass. 21, 24 (1983), even when the agreement does not, by its terms, survive the judgment. Retroactive application will further the rule by making it applicable to the hundreds, and perhaps thousands, of merged separation agreements currently in effect that seek to impose a measure of predictability on the financial arrangements between parties to divorce. Finally, there is no injustice to James, who agreed to pay long-term alimony to Judith. The findings disclose that he will not suffer financial hardship in continuing to do so.

circumstances requiring a downward modification pursuant to this provision in the agreement.

The probate judge found that in 1997, James sold his orthopedic practice for $360,000, along with two office condominiums for an additional $400,000. He continues to be employed part-time for the doctor who purchased the practice and at the time of trial, James's gross income was less than in prior years, approximately $120,000 per year. The judge also found that James "could be earning considerably more if he chose to work full time and to have retained his medical practice." James valued his "net estate" at trial as $3,470,000, including approximately $2,142,000 in retirement funds. This, as the judge noted, was more than twice the value of James's estate as of the date of the 1991 modification judgment.[12]

The findings clearly support the award of $3,385.34 per month as alimony, and James does not claim otherwise. There is also nothing in the findings to suggest that these payments, if continued beyond James's attaining age sixty-five, would be "unduly burdensome" to him; nor do the findings support elimination of the cost-of-living increases provided for in the January, 1991, modification judgment.

Finally, the agreement provided that James would maintain $200,000 in life insurance on his life,[13] reduced to $50,000 upon the emancipation of all three children. The agreement provides that "the Wife shall be designated the primary

---

[12]These values do not include Dorothy's assets. The judge found that James and Dorothy currently reside in a home in Naples, Florida, which had been owned individually by Dorothy, and was transferred to James in exchange for which James transferred to Dorothy assets having a value of $794,000. The December, 1985, findings reveal that "[i]n August of 1984, after this litigation began, James transferred to his present wife real estate located at [the same street and address in] Naples, Florida," where they now reside. See *Cooper* v. *Cooper*, 43 Mass. App. Ct. 51, 55 (1997) ("A Probate Court judge may consider the income or assets of a second spouse").

[13]Relevant portions of the agreement's life insurance provision are set forth below:

"The Husband agrees that upon his death his estate shall pay to the Wife for the benefit of the children the sum of $200,000. Such obligation shall be reduced to $150,000 upon the Wife's remarriage and shall be reduced by $50,000 as each of the children becomes emancipated, whether or not the Wife has then remarried. Such obligation shall cease when the Husband is no longer obligated to make payments under the

beneficiary" and that the obligation to provide life insurance "shall cease when the Husband is no longer obligated to make payments under" the support provisions of the agreement. We conclude that although it is elsewhere stated that upon James's death the payment shall be made "to the Wife for the benefit of the children," when read in the context of the entire agreement, it is evident that the parties intended that following emancipation of the children James would continue to maintain a $50,000 policy of life insurance until he no longer was obligated to pay alimony to Judith. See, e.g., *Kobico, Inc.* v. *Pipe*, 44 Mass. App. Ct. 103, 108 (1997) (specific and exact terms in contract given greater weight than general language).

So much of the judgment that orders (1) the cessation of alimony payments upon James attaining the age of 65, (2) the elimination of annual cost of living increases to alimony, and (3) the elimination of James's obligation to maintain life insurance is reversed, and the matter is remanded to the Probate Court for the entry of a judgment consistent with this opinion. On remand, the court may consider whether James should maintain $50,000 in life insurance or, in lieu thereof, an escrow account funded with $50,000, payable to Judith on James's death, but not otherwise available to meet James's current alimony obligation to Judith. In all other respects, the modification judgment is affirmed.

*So ordered.*

---

terms of Article II [setting forth the child support and alimony obligations].

"To secure his obligations under this Article V, the Husband shall maintain in effect life insurance policies with face values at least equal to the amount to which he is obligated from time to time.

"The Husband's life is presently insured under the policies listed and described in the Insurance Schedule attached with a current face amount of at least $200,000. The Husband may at his option substitute policies with at least equal face values of which the Wife shall be designated the primary beneficiary unless the Husband supplies other security acceptable to the Wife."