## CHARLOTTE KATZ *vs.* NATHAN KATZ.

No. 99-P-71.

Norfolk. December 6, 2001. - July 19, 2002.

Present: LAURENCE, GILLERMAN, & GRASSO, JJ.

*Divorce and Separation,* Alimony, Modification of judgment.

In a proceeding on a former husband's complaint for modification of alimony, where the evidence established the existence of valuable and potentially income-generating assets that were available to the husband to pay some level of support without impoverishing him, and where the record established that the wife, in the absence of any alimony, would be reduced to poverty, the Probate Court judge abused her discretion in effectively terminating the husband's alimony obligation without appropriate consideration of all the relevant circumstances. [478-484]

COMPLAINT for divorce filed in the Norfolk Division of the Probate and Family Court Department on July 7, 1976.

A complaint for modification, filed on September 17, 1996, was heard by *Eileen M. Shaevel,* J.

*Abbe L. Ross* for Charlotte Katz.

*Phyllis K. Kolman* for Nathan Katz.

LAURENCE, J. Charlotte Katz appeals from a Probate and Family Court judgment that effectively terminated her alimony from her former husband, Nathan Katz, on Nathan's second complaint for modification, by rapidly reducing it in periodic decrements from $450 per week to nothing over nineteen months. We conclude that this judgment reflected an abuse of discretion and remand.

*Background.* The facts underlying the judgment, as found by the probate judge and stipulated by the parties, are essentially undisputed. The Katzes were married in June, 1956, separated in May, 1970, and divorced in June, 1983, when Charlotte was forty-eight and Nathan fifty-one. The marriage produced three

children, two of whom were minors at the time of the divorce. The divorce judgment provided, inter alia, that Nathan pay unallocated alimony and child support to Charlotte in the amount of $550 per week. No express time limit or conditions subsequent were placed upon Nathan's alimony obligation in that judgment, nor was there any agreement between the parties relating to alimony. Charlotte also received sole ownership of the marital home in Quincy, while Nathan retained a Brookline condominium that he had purchased some time in the 1970's (and at some later date placed in an undisclosed type of tenancy with the woman who became his second wife). In addition to other obligations, such as paying for the two minor children's education, Nathan was ordered to pay Charlotte's life and health insurance premiums and to give her a lump sum of $100,000 on January 31, 1993, pursuant to the terms of a $315,000 promissory note then payable to Nathan by his employer. At the time of the divorce, Nathan was employed in a family retail business, earning $86,000 per year. Charlotte was a homemaker and primary caretaker of the children, had not been employed in sixteen years, and had no marketable skills.

Nathan remarried in 1983, soon after the divorce. Over the next nine years, he complied with all of the terms of the 1983 divorce judgment. By 1991, he was earning $125,000 a year from the family business. In January, 1992, however, he was effectively forced out of the business and into early retirement at age sixty (although he remained a "consultant" receiving $96.15 per week from the business, plus a $3,000 per year "clothing allowance" and an all-expenses paid automobile, for the next five years). Alleging materially changed employment and financial circumstances, Nathan filed for modification of his support obligation that same month, seeking to reduce it to $175 per week.

He obtained a temporary order that cut his payment to $450 per week, all of which represented alimony (the youngest child having become emancipated). While earning interest and consultant income of approximately $520 per week, Nathan claimed weekly expenses of $1,288, including the cost of Charlotte's alimony ($450) and insurance ($54.03). Although his assets then totaled $732,470 (which included his interest in

the Brookline condominium, the outstanding mortgage for which was his only liability) and he had been living "a comfortable lifestyle," he contended that, with the significant reduction in his income, he had to begin using his assets to meet his expenses and that, without relief, he would deplete those assets in ten years.[1] Charlotte's assets then amounted to $196,000, consisting entirely of her equity in the marital home and an anticipated $100,000 lump sum payment from the promissory note (from which, the judge noted, she would be paying off her existing liabilities of $25,519, exclusive of mortgage debt). Her estimated income was $515 per week, consisting of the $450 alimony and interest income from the $100,000 payment, while her weekly expenses were $546. The net result had been a reduction in her standard of living to "a spartan lifestyle."[2]

In her March, 1993, decision on Nathan's first complaint for modification, the judge permanently reduced his alimony obligation to $450 per week. As rationale for rejecting the more drastic alimony decrease that Nathan desired, the judge noted that "Nathan's financial security is set for the foreseeable future" while "Charlotte is almost totally dependent upon Nathan for her support"; that Nathan will be enjoying financial benefits from his former employer for another four years; and, most significantly, that he "will be relocating to Florida where he expects the cost of living to be less expensive." She praised Nathan's "taking steps to preserve his resources by making such a move," while admonishing Charlotte that she "likewise has an obligation to maximize the use of her resources"

---

[1]Nathan's 1993 prediction of destitution within a decade was found to be speculative and exaggerated. Based upon the judge's findings as to his income, assets, expenses and anticipated Social Security benefits, and even accepting the low rate of return that he "projected" on his investment assets — slightly over three per cent, which was then the Federal Reserve Board discount rate and half the prime rate, see 80 Fed. Reserve Bull. A8, A25 (Feb. 1994) (of which we take judicial notice as facts capable of accurate and ready determination, see *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. 62, 69 n.9 [1997]; Proposed Mass.R.Evid. 201[b]) — Nathan (then age sixty-one and by his account beset by numerous health problems [see note 3, *infra*]) would not exhaust his assets for twenty years even if he continued to pay Charlotte $450 per week.

[2]The gap between Charlotte's weekly expenses and income appears to have been bridged, in part if not entirely, by contributions from her adult daughter, Dayle, who lived with her but paid no rent.

(although she recognized that Charlotte "has little opportunity for [acquiring] other income" or *assets*) and warning Charlotte that she "needs to plan now for the possibility of a further reduction" should Nathan "spend down his resources more quickly than I project."

Following the 1993 modification, Nathan purchased a condominium in West Palm Beach, Florida, utilizing $112,000 of his investment funds (because of his claimed inability to qualify for a mortgage without a steady source of employment income). As he had eventually done with the Brookline condominium, Nathan took the West Palm Beach residence as a co-tenant with his second wife (the record does not indicate the exact nature of that concurrent ownership). He did not, however, fully "relocate" in Florida, as had been envisioned during the 1993 modification hearing, but continued to maintain his Brookline home. He and his second wife lived eight months of the year in West Palm Beach, then spent the remainder of their year (June through September) in Brookline. Nathan said that he went to Florida for health reasons[3] and returned to Brookline for health reasons, "plus . . . to spend time with" his second wife's mother, who lived in the Boston area.

Nathan filed a second complaint for modification, requesting "reducing or terminating" his alimony obligation to Charlotte, in September, 1996. The complaint was heard over a year later by the same judge who had presided over the 1993 modification and who made the following findings. Since the 1993 modification and the purchase of the West Palm Beach condominium, Nathan's assets had decreased to $478,293.29 (which included his "1/2 interests" in the Brookline and West Palm Beach condominiums, the total equity in which was $307,700). His weekly income was now $515.58, of which $297.28 was from interest income on his investments and $218.30 from Social Security benefits. His weekly expenses were $1,450.07, includ-

---

[3]Nathan's explanation of the reason for his "move" to Florida, given at the 1997 modification hearing (see discussion, *infra*), omitted any mention of his reducing his expenses, which had been viewed as a critical factor by the judge in 1993. The health problems he testified to at the 1997 hearing (without benefit of corroborating medical evidence) were ileitis, colitis, coronary artery disease, and a malignant form of skin cancer (the latter condition seemingly making Florida a questionable living environment).

ing the $450 per week alimony to Charlotte and $54.03 per week for her health insurance (an obligation that was, however, to expire in eighteen months when Charlotte would turn sixty-five). Nathan's nonmortgage liabilities had gone from zero to $26,600, all reflecting credit card debt; his mortgage balance on the Brookline condominium had declined to $23,000. Nathan had to withdraw funds from his investments in each of the years since 1993 to support himself and his second wife and meet his obligations to Charlotte;[4] and if that rate of withdrawal persisted, the judge concluded, "his retirement assets will be depleted in or within four years."

Charlotte's assets as of the 1997 hearing were $176,066.24, $129,217.37 of which consisted of her equity in the Quincy home and $34,364.21, the remainder of the $100,000 she had received in 1993. Her weekly income was then $575.80 ($450 in alimony, $106.15 in Social Security benefits, and $19.65 in interest income). Her weekly expenses had increased to $622.75, $174.81 of which were her continued mortgage payments on a mortgage balance of $60,382.63). Her liabilities, exclusive of the mortgage debt, consisted of $5,500 owed on several credit cards and $5,000 owed to her lawyers.

On these facts, the judge found that Nathan's lifestyle had "declined" to the level of "modest," while Charlotte's had not changed since 1993. The judge noted that Charlotte (then almost sixty-four) as well as Nathan (then almost sixty-six) continued to have "serious health problems" (hers including asthma, "De-ceuvrans Feno Sinuvitis" [a hand condition], severe back problems, and migraines) and found both of them to be unemployable. With respect to Nathan's continued maintenance of both the West Palm Beach and Brookline residences, the judge found that keeping the Brookline condominium was less expensive for Nathan than would be paying for a motel room or renting an apartment in Boston when he and his current wife came north during the summer months.

The judge praised Nathan's frugality in the face of the decline

---

[4]The "gross withdrawals" from his investments were $21,000 in 1993; $91,798 in 1994; $73,790 in 1995; $98,608 in 1996; and $95,000 in 1997. Satisfaction of obligations to Charlotte totaled $26,208 per year.

in his lifestyle[5] but was unremittingly critical of Charlotte's money management, citing her opting to collect Social Security benefits at age sixty-two, rather than awaiting a larger benefit at sixty-five; spending over $56,600 of the $100,000 from the promissory note over the prior four years[6] rather than "most efficiently manag[ing] the funds she received"; refinancing her home but inexplicably achieving a net saving of only approximately $10 per month; carrying a credit card balance at "high finance charges" while retaining a savings account that the judge assumed "yields a significantly lower rate of interest"; allowing her adult daughter, Dayle, who worked and was capable of paying rent, to continue living with her rent-free[7] ; and not being willing to rent a room in her house in order to obtain additional income and help defray expenses.

The judge concluded that Nathan had suffered a substantial change in circumstances since 1993 and ordered his alimony obligation to Charlotte to be terminated as of July, 1999, after periodic $100 reductions. In addition to Charlotte's criticized improvidence in managing her assets and "allow[ing] herself to be dependent on Nathan for her support, despite the possibility that his support could end" at any time upon his death, the judge's rationale rested upon her determination that "Nathan is already using his assets to support himself and his wife, Maureen . . . [and] should not be required to reduce his assets to zero by paying a support obligation he no longer has the ability to pay. . . . This is one of those unfortunate cases where both parties have needs, and there is simply not enough money to go around." Charlotte's subsequent motion to amend the findings

---

[5]She observed: "He uses coupons to save money at the supermarket, dines out infrequently . . . no longer attends sporting events or the theater." She also took special note of the fact that he "takes no vacation."

[6]The expenditures were her attorney's fees, taxes, part of her mother's funeral expenses, an $8,500 automobile, window replacement in her home, and credit card payments.

[7]What Dayle did and how much she earned were not put into the record. The judge did find that Dayle had helped pay for certain home improvements, including new kitchen wallpaper, a new boiler, a new refrigerator, and a new television set, and that she "also leaves money for groceries."

and judgment was denied without hearing.[8]

*Discussion.* Notwithstanding the breadth of discretion possessed by Probate Court judges when dealing with complaints for modification of alimony pursuant to G. L. c. 208, § 37, see *Schuler* v. *Schuler,* 382 Mass. 366, 368 (1981), the termination of Charlotte's alimony constituted, on this record, an abuse of that discretion and legal error. The judge failed to evaluate and balance, fairly and equitably — as was required — all of the circumstances relevant to the totality of the parties' situations, see *id.* at 370-373, 376, and to keep in mind "the fundamental purpose of alimony: to provide economic support to the dependent spouse." *Gottsegen* v. *Gottsegen,* 397 Mass. 617, 623 (1986). See *Grubert* v. *Grubert,* 20 Mass. App. Ct. 811, 811 (1985) (even "scrupulous and careful" effort by the probate judge is inadequate if it failed "adequately to take into account traditional alimony considerations and resulted in an inequitable award"); *Fugere* v. *Fugere,* 24 Mass. App. Ct. 758, 760 (1987) (modification decision must be based upon a balancing of all the financial and equitable factors); *Huddleston* v. *Huddleston,* 51 Mass. App. Ct. 563, 570 (2001) (modification must be "consistent with common sense and justice").

"It is apparent that [Charlotte] will not be able to satisfy her basic needs," *Fugere* v. *Fugere, supra* at 761, as a result of the judge's termination of all alimony payments by Nathan, given her weekly expenses of over $620 (approximately $175 of which was for mortgage payments alone) with a meager weekly income of approximately $106 in Social Security benefits and

---

[8]The judge also dismissed a complaint for contempt Charlotte had brought in response to Nathan's second complaint for modification, arising out of Nathan's failure to have paid two months of medical insurance premiums and alimony arrearages in the amount of $2,700. Nathan had, however, fully paid these amounts by the date of the modification hearing, and the judge credited his testimony that his failure to pay had been caused by temporary delays in his receipt of interest income and, therefore, had not been wilful. The judge also denied Charlotte's request for attorney's fees in connection with the contempt proceeding. Charlotte has also appealed those rulings, but we discern no abuse of discretion or other error of law and consequently affirm them. See G. L. c. 215, §§ 34, 34A; *Mullen* v. *Mullen,* 7 Mass. App. Ct. 899, 900 (1979); *Giannetti* v. *Thomas,* 32 Mass. App. Ct. 960, 961 (1992).

$20 of interest income.[9] Although the dependent spouse's "need for support and maintenance [is to be evaluated] in relationship to the respective financial circumstances of the parties . . . [and] grounded in the supporting spouse's ability to pay," *Gottsegen* v. *Gottsegen, supra* at 624, the judge's analysis fell seriously short of the requisite full, fair and equitable consideration in several respects: by disparately treating Charlotte's and Nathan's financial situations; by ignoring assets available to Nathan for continued (if reduced) support of Charlotte; by overlooking the reality that Nathan's claim of impending impoverishment by virtue of having to pay anything at all to Charlotte rested upon his having incurred self-imposed, voluntarily assumed expenses with full knowledge of his legal obligation to support his former wife; and by failing to give any consideration to the feasibility of Nathan's providing a continued, if lesser, amount of support to Charlotte.

The judge's flawed rationale supporting her termination decision flowed in large part from her employment of a double standard in analyzing the parties' respective circumstances. A fundamental defect was her glossing over the fact that Nathan's move to West Palm Beach while retaining his Brookline condominium not only resulted in his maintaining two homes year-round, but also constituted a conversion of his investment assets into a non-liquid second home that effected both a sizeable reduction of his investment assets and income and an increase (not a decrease, as he had represented in 1993) in his living expenses. Despite the financial imprudence of Nathan's conduct — which put him in the position of supporting *three* households — the judge entirely passed over it and reserved her adverse comments for Charlotte's not becoming more self-supporting by better management of her limited assets.

The judge particularly reproved Charlotte for not obtaining

[9]Charlotte's weekly income would provide her with an approximate gross annual income of $6,552, which placed her well below the poverty level of $8,240 for a single person in 1999, when her payments were ordered to cease (see Annual Update of the Health & Human Services Poverty Guidelines, 64 Fed. Reg. 13,428 [1999], of which we take judicial notice), raising the undesirable prospect of her becoming a public charge — a result to be avoided as a matter of public policy. See *O'Brien* v. *O'Brien*, 325 Mass. 573, 578 (1950); *Knox* v. *Remick*, 371 Mass. 433, 437 (1976).

(for reasons not appearing in the record) a better deal on the refinancing of her mortgage and for not having more profitably invested the $100,000 payment since 1993, but instead using much of it to pay various expenses (see note 6, *supra*)[10] (none of which, however, the judge found to have been excessive, unreasonable, or inappropriate).[11] Similarly, the judge criticized Charlotte for having chosen to receive Social Security benefits at 62 rather than 65 (when a higher benefit would have been available) as an example of her failure to maximize her resources (although Nathan had in fact done likewise). The judge chided Charlotte for maintaining a credit card balance of $5,500 at unstated interest rates assumed to be significantly higher than the interest (also undisclosed) that she earned on her savings account, but said nothing about Nathan's having increased his credit card debt from zero to $23,600 since 1993 (carried at interest rates not made part of the record).[12]

A particularly noteworthy inconsistency can be seen in the judge's chastising Charlotte for not requiring her live-in adult daughter to pay rent and not taking in a boarder for additional income, yet ignoring the fact that Nathan never attempted to secure rental income for the eight months (approximating the normal academic year) his Brookline property stood vacant or for the four months his West Palm Beach condominium was empty. The judge thus one-sidedly applied the principle that "[a] party has no right to waste an asset deliberately or ignore a feasible source of income . . . ." *Pagar* v. *Pagar*, 9 Mass. App. Ct. 1, 4 (1980). (A related incongruity can be seen in the judge's approving observation that Nathan, who had managed his affairs so as to be able to live in Florida during the winter and New England during the summer, "saved money" because he "takes no vacation," one of several cost-saving measures the

---

[10]In 1993, the judge had recognized that Charlotte would be using a sizeable portion of that payment to pay off existing liabilities (see discussion, *supra* at 474). At no point did the judge indicate how Charlotte should have "most efficiently manage[d] the funds she received," except to charge, unspecifically, that Charlotte's expenditures reflected "little planning."

[11]The judge said nothing about Nathan's undocumented use of the $3,000 "clothing allowance" or the $5,000 in "consultant" fees he had received from his former employer through 1997.

[12]See note 1, *supra*.

judge lauded Nathan for achieving, without mention of any of the sacrifices and privations Charlotte had presumably experienced in maintaining her "spartan" and "frugal lifestyle.")

An even more significant deficiency in the judge's evaluation was her failure to consider the extent to which Nathan's two properties could be utilized in reckoning his support obligation. Capital assets should be used to evaluate a supporting spouse's ability to pay alimony in a modification proceeding. See *Krokyn v. Krokyn*, 378 Mass. 206, 213-216 (1979); *Schuler v. Schuler*, 382 Mass. at 375-376; *Pagar v. Pagar*, 9 Mass. App. Ct. at 8; *Cooper v. Cooper*, 43 Mass. App. Ct. 51, 53 (1997). "Common sense and basic concepts of fairness support the notion that ownership of a valuable asset demonstrates ability to pay without further inquiry as to whether payment can be enforced directly against the asset. . . . The law does not require that an obligor be allowed to enjoy an asset — such as a valuable home or the beneficial interest in a spendthrift trust — while he neglects to provide for those persons whom he is legally required to support." *Krokyn v. Krokyn, supra* at 213-214.[18] Similarly, the judge did not consider the income, potential income, or assets of Nathan's second spouse in assessing

---

[18]Nathan's fleeting statement in his appellate brief that his property interests cannot be sold without the approval of his current wife is both factually and legally unsupported, as well as irrelevant under the authorities cited above. The judge's findings and Nathan's financial statements state merely that Nathan has a "½ interest" or "50% share" in the equity of each property. To the extent Nathan attempts to make a legal point in his favor, it constitutes inadequate appellate argument we need not address. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). Nonetheless, since Nathan owned the Brookline property, the more valuable of the two, before his remarriage, for alimony purposes "[i]t would be manifestly unfair to permit him to hide behind . . . his [presumed] transfer of [some interest in] the home into [his second wife's] name, to evade his [alimony] obligation to [his first wife] . . . [by such a] self-imposed [encumbrance]." *Cooper v. Cooper, supra* at 55. Moreover, even if Nathan and his second wife held the property as tenants by the entirety — which may be the unarticulated basis for the statement — it would not avail him; the assets, both in Massachusetts and Florida, should still be taken into consideration. *Krokyn v. Krokyn, supra* at 210-214. See *Shwachman v. Meagher*, 45 Mass. App. Ct. 428, 430-432 & n.4 (1998) (either spouse can convey or encumber his or her interest in a tenancy by the entirety created after February 11, 1980, without the other's consent).

Nathan's overall financial capability.[14] See *Bak* v. *Bak*, 24 Mass. App. Ct. 608, 623 (1987); *Cooper* v. *Cooper, supra* at 55-56.

The judge's conclusions that Nathan will "be required to reduce his assets to zero" within four years and "no longer has the ability to pay" any support obligation were unsupported and manifestly erroneous in light of the facts of record and applicable legal principles. So was her effective determination that Charlotte "could maintain herself without [any] assistance from the [former] husband." *Barron* v. *Barron*, 28 Mass. App. Ct. 755, 758 (1990). Such a view was not only dismissive of the penury into which Charlotte was being thrust, contrary to public policy (see note 9, *supra*), but also disregarded the fact that, to a significant extent, the "limits on [Nathan's] ability to provide [continued] support to [Charlotte] are self-imposed . . . [and reflect] an obligor's ability to manipulate his resources to avoid his legal obligations." *Id.* at 759. Cf. *Schuler* v. *Schuler*, 382 Mass. at 372 (an obligor's personal aspirations "must be balanced against his obligations to support his former [as well as] present families"); *Newman* v. *Newman*, 12 Mass. App. Ct. 874, 875 (1981) (the fact that an obligor whose income had diminished chooses to use his assets to satisfy other creditors rather than pay alimony is no defense to a contempt action for failure to pay).

The judge's rationale for termination appears to have sympathetically heeded Nathan's plaintive protests of hardship.[15] It neglected, however, the following mandates: that the abrupt termination of otherwise unconditional and indefinite alimony[16] demands "clear and adequate explanation," *Bowring* v. *Reid*, 399 Mass. 265, 268 (1987); and that an arbitrary limitation on

[14]The judge's findings are silent as to the second wife's age, health status, educational background, job experience, and employment or income potential at any time relevant to these proceedings.

[15]Nathan testified, "I've had stress in my life every day thinking about the monies I have for the future, and I want some finality to this. . . . I can't afford it health wise, or financial wise. . . . I want some finality to it. I've worked for forty-five years. I deserve some consideration, and my [current] wife deserves some consideration as well."

[16]As noted above, the original judgment reflected no expectation or intention that Nathan's alimony obligation was to end short of his death or clearly established inability to pay. See *Huddleston* v. *Huddleston*, 51 Mass. App. Ct. at 570. Cf. *Freedman* v. *Freedman*, 49 Mass. App. Ct. 519, 523 (2000).

the duration of an alimony obligation to a spouse whose needs are current and predictable is unwarranted when based on an assumption of future events, the occurrence of which is uncertain or unpredictable. See *Goldman* v. *Goldman*, 28 Mass. App. Ct. 603, 612-613 (1990); *Martin* v. *Martin*, 29 Mass. App. Ct. 921, 922-923 (1990); *Ross* v. *Ross*, 50 Mass. App. Ct. 77, 80-81 (2000). The judge erroneously accepted the underlying premise of Nathan's effort to end his support of Charlotte, viz., his right to prefer his second family over his first (see note 15, *supra*). To the contrary:

> "We do not believe that the [former husband] ought to be permitted to shift to the public the obligation he assumed when he married [his first wife]. It may be that because of his second marriage he will suffer some financial hardship, but the short answer to that is that he must have entered into the second marriage conscious of his obligations to his former wife so that the second marriage with its attendant obligations affords him no relief."

*O'Brien* v. *O'Brien*, 325 Mass. 573, 578 (1950).

Of course, a support provider does not "have to deplete his total liquid or other assets in an effort to meet his support obligations." *Schuler* v. *Schuler*, 382 Mass. at 375. Nathan's ability to pay, when considered in the context of the entirety of the parties' respective financial situations and upon an even-handed balancing of the equities, may well have become sufficiently straitened to warrant some, perhaps a substantial, lessening of his alimony obligation. We now simply hold that when, at the time of the hearing on the complaint for modification, the evidence established the existence of valuable and potentially income-generating assets that were available to Nathan to pay some level of support without in fact impoverishing him, as well as the likely reduction of Charlotte to poverty, if not destitution, in the absence of any alimony, the termination of Nathan's alimony obligation without appropriate consideration of all the relevant circumstances constituted reversible error.

Accordingly, we reverse the judgment on the 1997 complaint for modification and remand this case to the Probate and Family

Court for further proceedings consistent with this opinion. The order of alimony established by the 1993 modification judgment is reinstated as of the date of this opinion and is to stand until revision by a probate judge, who shall take into account, inter alia, whether any retroactive amounts shall be due. Neither party is to have the costs of this appeal.

*So ordered.*